UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MINDY R. TWER and HOWARD ABRAMS, | : | CIVIL ACTION NO. _____ |
| Plaintiffs, | : | |
| v. | : | |
| UNIVEST BANK & TRUST CO., successor by merger to FOX CHASE BANK, | : | |
| Defendant. | : | |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that, pursuant to 28 U.S.C. §§ 1441 and 1446, defendant Univest Bank & Trust Co., successor by merger to defendant Fox Chase Bank (the "Bank"), hereby removes to this Court the action captioned *Twer v. Univest Bank & Trust Co.*, No. 2014-08576 (the "State Court Action") from the Court of Common Pleas of Bucks County (the "State Court"). The grounds for removal are as follows:

## THE REMOVED CASE

1.      Plaintiffs Mindy R. Twer and Howard Abrams  (collectively, "Plaintiffs") initiated the State Court Action by filing a writ of summons on December 10, 2014.  A true and correct copy of the Writ of Summons is attached hereto as Exhibit 1.

2.      The State Court issued a Notice of Proposed Termination of the State Court Action on January 5, 2017, to which Plaintiffs responded by filing a Notice of Intent to Proceed on March 1, 2017.  True and correct copies of these documents are attached hereto at Exhibits 2 and 3, respectively.

3.     On May 17, 2017, the State Court entered a Preliminary Termination Order requiring the parties to take action within forty-five (45) days from the date of the order or else risk termination of the State Court Action.  A true and correct copy of the Preliminary Termination Order is attached hereto as Exhibit 4.

4.     Plaintiffs filed a Case Status Report and Request for a Hearing/Conference ("Status Report") on June 30, 2017, thereby avoiding termination of the State Court Action.  A true and correct copy of the Status Report is attached hereto as Exhibit 5.

5.     On September 8, 2017, the State Court entered an Order for Hearing, which was docketed and sent  to the parties on September 11, 2017.  A true and correct copy of the Order for Hearing is attached hereto as Exhibit 6.

6.     A Rule to File Complaint was issued on September 29, 2017. A true and correct copy of the Rule to File Complaint is attached hereto as Exhibit 7.

7.     Following a hearing,  State Court entered a Case Management Order on October 20, 2017. A true and correct copy of the Case Management Order is attached hereto as Exhibit 8.

8.     On November 1, 2017, the State Court entered two Orders Approving Stipulations of Counsel as to  (1) a deadline of November 8, 2017 for the filing of Plaintiffs' complaint in the State Court Action; and (2) a modification of the case caption.  The Orders Approving Stipulations of Counsel are attached hereto as Exhibits 9 and 10, respectively.

9.     Plaintiffs filed a complaint in the State Court Action on November 13, 2017 (the "Complaint").  The Complaint alleges a number of claims against the Bank, all of which relate to and arise from two loans (the "Loans") made by the Bank and the Bank's conduct throughout the

lending relationship and in pursuit of recovery of the Loans.  A true and correct copy of the

Complaint is attached hereto as Exhibit 11.

10.     The foregoing represent "all process, pleadings, and orders" served upon the Bank

in the State Court action. 28 U.S.C. § 1446 (a).

## SUBJECT MATTER JURISDICTION

11.     A defendant may remove "any civil action brought in a State court of which the

district courts of the United States have original jurisdiction…to the district court of the United

States for the district and division embracing the place where such action is pending." 28

U.S.C.§ 1441(a).

12.     "The district courts shall have original jurisdiction of all civil actions arising

under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.

13.     In Counts IV and V of their Complaint, Plaintiffs allege the Bank violated a

federal statute, the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et. seq*. ("ECOA").  Ex. 11

¶¶ 212-221.  Plaintiffs allege the Bank violated ECOA with respect to the Loans and, as a result,

demands that the promissory notes for the Loans be deemed null and void and that the Bank pay

to Plaintiffs compensatory damages plus interest, costs, attorneys' fees, and punitive damages.

Ex. 11 ¶¶ 213-216, 218-221.

14.     The ECOA is a federal statute, and thus is a law of the United States under 28

U.S.C. § 1331.  Accordingly, this Court has original jurisdiction of Plaintiffs' ECOA claims

pursuant to 28 U.S.C. § 1331.

15.     "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a).

16.     The Complaint contains seven counts in addition to the ECOA violations alleged in Counts IV and V.  Each of these seven counts appear to be asserted under the common law of the Commonwealth of Pennsylvania and relate to the same lending relationship upon which the ECOA claims are based.

17.     Plaintiffs' common law claims therefore relate to and arise from the same facts and circumstances upon which Plaintiffs' ECOA counts are premised—the Loans and the lending relationship — and are thus part of the same case or controversy as the ECOA claims. This Court therefore has supplemental jurisdiction over the common law claims under 28 U.S.C. § 1367.

18.     Removal of this matter is therefore proper under 28 U.S.C. § 1441(a), because this Court has original jurisdiction over the ECOA claims, and has supplemental jurisdiction over Plaintiffs' common law claims.

## VENUE

19.     Venue is proper in this Court pursuant to 28 U.S.C. § 1441(a), as the Eastern District of Pennsylvania embraces Bucks County, where the State Court Action is pending.

## REMOVAL IS TIMELY

20.     "The notice of removal of a civil action or proceeding shall be filed within 30 days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based." 28 U.S.C.§ 1446(b)(1).

21.     The Writ of Summons by which Plaintiffs first initiated the State Court Action does not provide a description of Plaintiffs' claims for relief.  *See* Ex. 1.  Both Plaintiffs' later-filed Notice of Intent to Proceed and Status Report likewise lack any reference to the nature of the relief claimed in the State Court Action. *See* Exs. 3, 5.

22.     The Complaint, filed on November 13, 2017, and served on the Bank on November 13, 2017, is the first pleading setting forth the claims for relief upon which the State Court Action is based, and the first pleading from which it is possible to ascertain that this action is removable.  *See* Exs. 1-2, 11.

23.     This Notice of Removal is therefore timely, as it has been filed within 30 days of the Bank's receipt, through service or otherwise, of a copy of the Complaint, which is the initial pleading setting forth the claim for relief upon which the State Court Action is based.  28 U.S.C. § 1446(b).

## NOTICE TO OTHER PARTIES

24.     Pursuant to 28 U.S.C. §1446(d), the undersigned certifies that, promptly after this Notice of Removal is filed, written notice thereof shall be served upon Plaintiffs and the Prothonotary of the Court of Common Pleas of Bucks County.

WHEREFORE, defendant Univest Bank & Trust Co., successor by merger to defendant Fox Chase Bank, hereby removes the above-captioned action from the Court of Common Pleas of Bucks County pursuant to 28 U.S.C. §§ 1441 & 1446.


Dated: November 27, 2017       KLEHR HARRISON HARVEY BRANZBURG LLP


By: _____
William R. Hinchman
Paige M. Willan
Kelsey Hughes-Blaum
1835 Market Street
Philadelphia, PA 19103
(215) 569-2700
whinchman@klehr.com
pwillan@klehr.com
kblaum@klehr.com

*Attorneys for Defendant*
*Univest Bank and Trust Co.*

## CERTIFICATE OF SERVICE

I, Paige M. Willan, hereby certify that, on November 27, 2017, I caused a true and correct copy of the foregoing Notice of Removal to be served via first class mail, postage pre-paid, on counsel for Plaintiffs Mindy R. Twer and Howard Abrams at the following address:

David M. Twer, Esquire
David Mr. Twer & Associates
1234 Bridgetown Pike
Suite 200
Feasterville, PA 19053

Paige M. Willan

**<u>Exhibit 1</u>**
**Writ of Summons**

# Supreme Court of Pennsylvania
## Court of Common Pleas
## Civil Cover Sheet

**Bucks** _____ **County**



For Broth[er]

Case #: 2014-08576  B09   10738113

Code: 0        Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: 2014-36-04680   12/10/2014 4:13:21 PM

ME STAMP

*The information collected on this form is used solely for court administration purposes. This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.*

---

## SECTION A

**Commencement of Action:**
- [ ] Complaint
- [X] Writ of Summons
- [ ] Petition
- [ ] Transfer from Another Jurisdiction
- [ ] Declaration of Taking

| Lead Plaintiff's Name: | Lead Defendant's Name: |
|---|---|
| Mindy R Twer | Fox Chase Bank |

**Are money damages requested?** [X] Yes  [ ] No

Dollar Amount Requested: (check one)
- [ ] within arbitration limits
- [X] outside arbitration limits

**Is this a *Class Action Suit*?** [ ] Yes  [X] No

**Is this an *MDJ Appeal*?** [ ] Yes  [X] No

Name of Plaintiff/Appellant's Attorney: **David M Twer ESQ**

- [ ] Check here if you have no attorney (are a Self-Represented [Pro Se] Litigant)

---

## SECTION B

**Nature of the Case:** Place an "X" to the left of the **ONE** case category that most accurately describes your **PRIMARY CASE.** If you are making more than one type of claim, check the one that you consider most important.

**TORT** *(do not include Mass Tort)*
- [ ] Intentional
- [ ] Malicious Prosecution
- [ ] Motor Vehicle
- [ ] Nuisance
- [ ] Premises Liability
- [ ] Product Liability *(does not include mass tort)*
- [ ] Slander/Libel/ Defamation
- [ ] Other:

**MASS TORT**
- [ ] Asbestos
- [ ] Tobacco
- [ ] Toxic Tort - DES
- [ ] Toxic Tort - Implant
- [ ] Toxic Waste
- [ ] Other:

**PROFESSIONAL LIABLITY**
- [ ] Dental
- [ ] Legal
- [ ] Medical
- [ ] Other Professional:

**CONTRACT** *(do not include Judgments)*
- [ ] Buyer Plaintiff
- [ ] Debt Collection: Credit Card
- [ ] Debt Collection: Other

- [ ] Employment Dispute: Discrimination
- [ ] Employment Dispute: Other

- [X] Other: *Creditor* Debtor Plaintiff

**REAL PROPERTY**
- [ ] Ejectment
- [ ] Eminent Domain/Condemnation
- [ ] Ground Rent
- [ ] Landlord/Tenant Dispute
- [ ] Mortgage Foreclosure: Residential
- [ ] Mortgage Foreclosure: Commercial
- [ ] Partition
- [ ] Quiet Title
- [ ] Other:

**CIVIL APPEALS**
Administrative Agencies
- [ ] Board of Assessment
- [ ] Board of Elections
- [ ] Dept. of Transportation
- [ ] Statutory Appeal: Other

- [ ] Zoning Board
- [ ] Other:

**MISCELLANEOUS**
- [ ] Common Law/Statutory Arbitration
- [ ] Declaratory Judgment
- [ ] Mandamus
- [ ] Non-Domestic Relations Restraining Order
- [ ] Quo Warranto
- [ ] Replevin
- [ ] Other:

*Updated 1/1/2011*

DAVID M. TWER, ESQUIRE
DAVID M. TWER & ASSOCIATES
1234 Bridgetown Pike
Suite 200
Feasterville, PA 19053
(215) 953-7600
Attorney I.D. #44044

Joel G. Kalman, Esquire
Kalman Plaza
105 Paddlewheel Circle
Southampton, PA 18966
(215) 364-2889
Attorney I.D. #21391                                    Attorney for Plaintiffs

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| Mindy R. Twer | : | |
| 17 Mayflower Circle | : | |
| Holland, PA 18966 | : | |
| | : | |
| and | : | NO. |
| | : | |
| Howard Abrams | : | |
| 64 Timothy Drive | : | |
| Ivyland, PA 18974 | : | |
| | : | |
| v. | : | |
| | : | |
| Fox Chase Bank | : | |
| 815 Bustleton Pike | : | |
| Richboro, PA 18954 | : | |

Case #: 2014-08576  B09    10738113

Code: 0        Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: 2014-36-04680  12/10/2014 4:13:21 PM

## PRAECIPE FOR WRIT OF SUMMONS

**TO THE PROTHONOTARY:**

Issue a Writ of Summons in the above stated action.

David M. Twer, Esquire
Attorney for Plaintiffs

DAVID M. TWER, ESQUIRE
DAVID M. TWER & ASSOCIATES
1234 Bridgetown Pike
Suite 200
Feasterville, PA 19053
(215) 953-7600
Attorney I.D. #44044

Joel G. Kalman, Esquire
Kalman Plaza
105 Paddlewheel Circle
Southampton, PA 18966
(215) 364-2889
Attorney I.D. #21391                                    Attorney for Plaintiffs

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

Mindy R. Twer                              :
17 Mayflower Circle                        :
Holland, PA 18966                          :
                                           :
    and                                    : NO.  *2014- 8576*
                                           :
Howard Abrams                              :
64 Timothy Drive                           :
Ivyland, PA 18974                          :
                                           :
    v.                                     :
                                           :
Fox Chase Bank                             :
815 Bustleton Pike                         :
Richboro, PA 18954                         :

## WRIT OF SUMMONS

To:    Fox Chase Bank
       815 Bustleton Pike
       Richboro, PA 18954

       You are hereby notified that Mindy R. Twer and Howard Abrams have commenced an

action against you.

Date: _12-10-2014_

PATRICIA L. BACHTLE
Prothonotary

By: _Kijma Trypitis, deputy_

Seal of the Court

**Exhibit 2**
**Notice of Proposed Termination**

In the Court of Common Pleas Bucks County, Pennsylvania
PA RCP 230.2 - Notice of Proposed Termination of Court Case

2014-08576
TWER, MINDY R vs. FOX CHASE BANK
1/5/2017 12:00:00 AM

FOX CHASE BANK
815 BUSTLETON PIKE
RICHBORO, PA 18954

David M. Twer, Esq.
DAVID M TWER & ASSOCIATES
1234 BRIDGETOWN PIKE
SUITE 200
FEASTERVILLE, PA 19053
HOWARD ABRAMS
64 TIMOTHY DRIVE
IVYLAND, PA 18974

**Exhibit 3**
**Notice of Intent to Proceed**

 IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY PENNSYLVANIA

## NOTICE OF PROPOSED TERMINATION OF COURT CASE

The court intends to terminate this case without further notice because the docket shows no activity on the case for at least two years.

You may stop the court from terminating the case by filing a Statement of Intention to Proceed. The Statement of Intention to Proceed should be filed with the Prothonotary of the Court, Patricia L. Bachtle, at the Bucks County Courthouse, 55 East Court Street, Doylestown PA 18901 on or before 3/7/2017.

**IF YOU FAIL TO FILE THE REQUIRED STATEMENT OF INTENTION TO PROCEED, THE CASE WILL BE TERMINATED BY THE COURT.**

1/5/2017

Date of this Notice

BY ORDER OF:
Jeffrey L. Finley
President Judge

Case #: 2014-08576  B09   11535710

Code: 273      Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: 2017-24-00387   3/2/2017 12:44:33 PM

DOCKET #                                          CIVIL ACTION

2014-08576   START 12/10/2014

**PLAINTIFF**            **VS**               **DEFENDANT**

TWER, MINDY R                              FOX CHASE BANK
ABRAMS, HOWARD

## STATEMENT OF INTENTION TO PROCEED

To the Court:

_Mindy R Twer & Howard Abrams_ intends to proceed with the above captioned matter.

Date: 3-1-17

(signature) _[signature]_

Attorney for _Mindy R Twer & Howard Abrams_

## A FILING FEE OF $9.00 PAYABLE TO THE PROTHONOTARY MUST ACCOMPANY THE STATEMENT OF INTENTION TO PROCEED.



112   LWL-15B   19053

David M. Twer, Esq.
DAVID M TWER & ASSOCIATES
1234 BRIDGETOWN PIKE
SUITE 200
FEASTERVILLE, PA 19053

01-05-17

COURT ADMINISTRATION
BUCKS COUNTY COURTHOUSE
55 EAST COURT STREET
DOYLESTOWN, PA 18901




ZIP 18901
02 1W
0001393158 JAN 06, 2
$ 000.3



PRESOR
FIRST CL

**Exhibit 4**
**Preliminary Termination Order**

| MINDY R TWER<br>HOWARD ABRAMS | No. 2014-08576 |
|---|---|
| vs. | |
| FOX CHASE BANK | |

### Preliminary Termination Order

**THIS ORDER IS ISSUED REGARDLESS OF ANY RECENT DOCKET ACTIVITY IN THE MATTER, INCLUDING THE FILING OF A CERTIFICATE OF ACTIVE STATUS.  THE PARTIES ARE DIRECTED TO COMPLY WITH THESE DIRECTIVES REGARDLESS OF ANY SUCH RECENT DOCKET ACTIVITY.**

AND NOW, this 17th day of May, 2017, the docket in the above matter suggesting a lack of substantive progress toward resolution of the case, it is hereby **ORDERED that within 45 days of the date of this Order:**

1. Plaintiff shall file with the Prothonotary a Praecipe to Settle, Discontinue and End the matter and forward a copy of the filed Praecipe to the Office of the Court Administrator; **or**

2. The parties shall file with the Prothonotary an agreed Case Management Order in the form available at http://www.buckscounty.org/Courts/DocketForms (which may also be obtained in hard copy from the Office of the Prothonotary).  The parties shall include all information required by the form, and forward a copy of the filed Agreed Order to the Office of the Court Administrator; **or**

3. Any party shall file with the Prothonotary a Case Status Report and Request for Hearing in the form available at http://www.buckscounty.org/Courts/DocketForms (which may also be obtained in hard copy from the Office of the Prothonotary).  The filing party shall include all information required by the form, and forward a copy of the filed report to the Office of the Court Administrator.

**Should the parties fail to take one of the three enumerated actions within 45 days hereof, the Court will enter an Order terminating the matter without further notice.**

All parties and counsel receiving this Order are required to provide actual notice of this order to any interested parties and counsel within ten (10) days of the date of this Order.

BY THE COURT:

Robert O. Baldi, J.

Bucks County Court of Common Pleas
100 N. Main St.
Doylestown, PA  18901

Notifications sent to:
FOX CHASE BANK
815 BUSTLETON PIKE, RICHBORO, PA 18954,
Twer, David M., dmtwer@aol.com, dmtwer@gmail.com

**Exhibit 5**
**Case Status Report and Request for Hearing/Conference**

IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
CIVIL DIVISION

Mindy R Twer, and     Fox Chase Bank      :    No.    2014-08576
Howard Abrams                                 :
                    :
           v.                          :
                    :
                    :

**CASE STATUS REPORT AND REQUEST FOR HEARING/CONFERENCE**

1. The name and current, valid contact information, including addresses and
   telephone numbers, for ALL counsel in this matter.  Should any party be
   unrepresented, provide a current address for such party;

   David M. Twer, Esq. 1234 Bridgetown Pike, Suite 200, Feasterville, PA 19053
   215-953-7600, Attorney for Plaintiff
   Fox Chase Bank, no entry of appearance, 815 Bustleton Pike, Richboro, PA
   18954

2. The date of the last substantive case activity in this matter prior to receipt of the
   order referring you to this form, and describe the nature of such activity;

   March 2, 2017 Statement of Intention to Proceed by Plaintiff

3. The date of service of the last discovery request(s) served upon counsel/parties
   in this matter prior to receipt of the order referring you to this form, and describe
   the nature of such request(s);

   N/A

4. The most recent date on which you provided discovery responses to
   counsel/parties in this matter prior to receipt of the order referring you to this
   form, and describe the nature of such responses;

   N/A



Case #: 2014-08576-0009    11639515

Code: 851                Judge:34
Patricia L. Bachde, Bucks County Prothonotary
Rcpt: Z1813539   6/30/2017 11:37:07 AM

5. The date of the last communication by telephone or correspondence between counsel and/or the parties in this matter prior to receipt of the order referring you to this form, and describe the nature of such communication; and
N/A

6. A brief statement addressing why this matter should not be terminated.
Plaintiff has not been motioned for non pros or otherwise in this matter.  It is Plaintiff's intent to file and serve a complaint in this mater prior to the anticiapted date of hearing in this matter.  Plaintiff will present a proposed Case Management Order at the time of hearing.

Date: 6-30-17                    Signature: _____

**VERIFICATION**

I, David M Twa, esq                    , verify that the facts set forth in the foregoing

Case Status Report are true and correct to the best of my knowledge, information and

belief.   I understand that false statements made herein are made subject to the

penalties of 18 Pa. C.S. § 4904, relating to unsworn falsification to authorities.

Date: 6-30-17                    _____
                                Name:

## CERTIFICATE OF SERVICE

I certify that on the 30th day of June, 2017 a true and correct copy of the within Case Status

Report and Request for Hearing/Conference was served by first class mail, postage prepaid upon

the person(s) listed below:


Fox Chase Bank
815 Bustleton Pike
Richboro, PA 18954

Defendants (no attorney of record)

David M. Twer, Esquire
Attorney for Plaintiffs

**Exhibit 6**
**Order for Hearing**

*See attached*

## IN THE COURT OF COMMON PLEAS, BUCKS COUNTY PENNSYLVANIA
### CIVIL DIVISION

MINDY R. TWER, et al.              :        NO.: 14-8576

     v.                          :

FOX CHASE BANK                     :

Case #: 2014-08576-0011    11697055
Code: 129          Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: Z1852148   9/8/2017 11:28:10 AM

### ORDER FOR HEARING

**AND NOW**, this 8th day of September, 2017, it is hereby ORDERED that a case management conference shall be held on the **20th day of October, 2017** at **9:30 a.m.** in Courtroom **340** of the Bucks County Justice Center, 100 N. Main Street, Doylestown, PA.

All parties and counsel receiving this Order are required to serve any interested parties or counsel not of record within ten (10) days of the date of this Order, a copy of this Order.

All parties are required to attend either personally or by counsel.

The purpose of the conference is to create a Case Management Order. The Court will consider a party's failure to appear sanctionable. If a party fails to appear an Order may be entered terminating that party's right to proceed further with any claims that party had been asserting in the law suit. The Order could include dismissal of the Plaintiff's case, dismissal of a Defendant's counter-claim and/or a Defendant's cross-claim.

Should the matter be settled prior to the date of the hearing, the Plaintiff may file a Praecipe to Settle, Discontinue and End and provide the Court with notice of same prior to the date of the hearing.

N.B. It is your responsibility to notify all interested parties of the above action.

THIS ORDER/JUDGMENT WAS DOCKETED AND SENT ON 09/11/2017 PURSUANT TO PA. R. C. P. 236.

**No continuance requests will be entertained** by the Court **unless** or until **all parties are provided notice of the request, and their position must be acknowledged** and stated **in the written request for a continuance**.  In lieu of appearing in Court, the parties may file with the Prothonotary an Agreed Case Management Order prior to the hearing date.  A copy of the Agreed Case Management Order can be located at

<u>http://www.buckscounty.org/Courts/DocketForms</u>

BY THE COURT:

_____

ROBERT O. BALDI,     J.

Copies of this Order are being sent to the following:

David M. Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA  19053

Fox Chase Bank
815 Bustleton Pike
Richboro, PA  18954

**Exhibit 7**
**Rule to File Complaint**

# IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA
## CIVIL DIVISION

MINDY R TWER

vs.

FOX CHASE BANK

NO.  2014-08576

**PRAECIPE AND RULE TO FILE**

**TO THE PROTHONOTARY/CLERK OF SAID COURT;**

Issue rule upon HOWARD ABRAMS; MINDY R TWER to file a complaint in the above case within twenty (20) days after service of the rule or upon praecipe, suffer a judgment of non pros.

ORIGINAL SIGNATURE RETAINED BY THE FILING PARTY
_____
Signature

Ms. Kelsey Hughes-Blaum, Esq.
_____
Filing Party

Date:   09/29/2017

322313
_____
ID Number

Klehr Harrison Harvey Branzburg LLP
_____

_____
Firm Name

1835 Market Street, Suite 1400
_____

_____
Address

Philadelphia, PA 19103
_____

2155691959
_____
Phone

NOW, 09/29/2017, A RULE IS ISSUED AS ABOVE.



_____
Prothonotary

Jacqueline M. Prunkel
_____
Deputy

Case# 2014-08576-14 - JUDGE:34   Received at County of Bucks Prothonotary Office on 09/29/2017 2:36 PM, Fee = $0.00

Case# 2014-08576-14 - JUDGE:34  Received at County of Bucks Prothonotary Office on 09/29/2017 2:36 PM, Fee = $0.00

**KLEHR HARRISON HARVEY BRANZBURG LLP**
William R. Hinchman, Esquire  (I.D. No.: 60540)
Kelsey Hughes-Blaum, Esquire (I.D. No.: 322313)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700

*Attorneys for Defendant*

| | | |
|---|---|---|
| MINDY R. TWER and | : | COURT OF COMMON PLEAS |
| HOWARD ABRAMS | : | BUCKS COUNTY |
| Plaintiffs, | : | |
| v. | : | CIVIL ACTION |
| | : | |
| FOX CHASE BANK | : | No. 2014-08576 |
| | : | |
| Defendant. | : | |

## CERTIFICATE OF SERVICE

I, Kelsey Hughes-Blaum, Esquire, hereby certify that on this 29th day of September,

2017, I have served a true and correct copy of the foregoing Praecipe for Issuance of Rule to File

Complaint on the following counsel via U.S. Mail, postage prepaid:

David M. Twer, Esquire
1234 Bridgetown Pike
Suite 200
Feasterville, PA 19053

*/s/Kelsey Hughes-Blaum*
Kelsey Hughes-Blaum, Esquire

PHIL1 6515468v.1

**Exhibit 8**
**Case Management Order**

**IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA**
**CIVIL DIVISION**

MINDY R. TWER, et al.  :  NO.: 14-8576

v.  :

FOX CHASE BANK  :

## CASE MANAGEMENT ORDER

And now, this _20th_ day of _Oct_ , 20_17_, after a conference with the parties, the following Case Management Schedule is made an Order of the Court governing the conduct and timelines of this matter going forward.

1. All factual discovery shall be completed no later than _May 9, 2018_.

2. Plaintiff's expert reports shall be submitted _March 15, 2018_

3. Defendant's expert reports shall be submitted _April 30, 2018_

4. All supplemental expert reports shall be submitted _June 16, 2018_

5. Should a party desire to file any dispositive motion(s), said motion(s) shall be filed not later than _June 23, 2018_, with response(s) to such motion(s) to be filed no later than _July 23, 2018_

6. A copy of all exhibits either party intends to present into evidence at the time of Arbitration/Trial shall be served on all other parties not later than _June 16, 2018_, with each exhibit being pre-marked and identified with a written list of exhibits which will accompany that submission.

7. The Court Administrator shall consider this matter as certified ready for Arbitration/Trial on _Sept 3, 2018_ and shall thereafter list the matter for Arbitration/Trial as though the matter had been certified by counsel as ready on said date.

N.B. It is your responsibility to notify all interested parties of the above action.

8. For purposes of receiving notice, the parties and counsel of record, as well as their contact information are as follows (if additional space is needed please attach a separate sheet of paper):

David Twer, Esq.
1234 Bridgetown Pike
Ste 200
Feasterville PA
19053

Kelsey Hughes-Blaum, Esq.
1835 Market St.
Philadelphia PA
19103

9. The parties estimate the amount of time needed for this Trial is _____ 3 1/2 _____ hours/days (Please circle one)

10. The trial will be:

☐ Jury

☒ Non-Jury

☐ Arbitration

11. Should this matter be settled prior to listing for Arbitration/Trial, the Plaintiff shall file a Praecipe to Settle, Discontinue and End this matter.

BY THE COURT:

10/20/17
**Date**

Robert O. Baldi, Judge          **J.**

**Exhibit 9**
**Order Approving Stipulation of Counsel (Complaint Deadline)**



Case #: 2014-08576-0018    11745469

Code: 76                    Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt Z1883912  11/3/2017 12:37:18 PM

**KLEHR HARRISON HARVEY BRANZBURG LLP**
William R. Hinchman, Esquire  (I.D. No.: 60540)
Kelsey Hughes-Blaum, Esquire (I.D. No.: 322313)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700

*Attorneys for Defendant*



| | | |
|---|---|---|
| MINDY R. TWER and<br>HOWARD ABRAMS | : | COURT OF COMMON PLEAS<br>BUCKS COUNTY |
|              Plaintiffs, | : | |
|   v. | : | CIVIL ACTION |
| | : | |
| FOX CHASE BANK | : | No. 2014-08576 |
|              Defendant. | : | |

<u>**STIPULATION AS TO DEADLINE FOR PLAINTIFFS' FILING OF COMPLAINT**</u>

IT IS HEREBY STIPULATED AND AGREED by and between plaintiffs Mindy R. Twer

and Howard Abrams ("Plaintiffs") and defendant Univest Bank & Trust Co., successor by

merger to Fox Chase Bank ("Defendant"), through their undersigned counsel, that Plaintiffs shall

file their Complaint in this action no later than November 8, 2017 or be subject to *non pros.*

KLEHR | HARRISON | HARVEY |
BRANZBURG LLP

By: _____
William R. Hinchman, Esquire
Kelsey Hughes-Blaum, Esquire
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700
*Attorneys for Defendant*

DAVID M. TWER & ASSOCIATES

By: _____
David M. Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA 19053
(215) 953-7600
*Attorney for Plaintiffs*

APPROVED AND SO ORDERED
this _____ day of _November_, 2017

_____
**WALLACE H. BATEMAN, JR., JUDGE** J

PHIL1 6570547v.1

**N.B.   It is your responsibility
to notify all interested parties
of the above action.**

THIS ORDER/JUDGMENT WAS DOCKETED AND SENT ON 11/06/2017 PURSUANT TO PA. R. C. P. 236.
OCT 3 1 2017

Case# 2014-08576-17 - JUDGE:34   Received at County of Bucks Prothonotary Office on 10/27/2017 10:32 AM, Fee = $0.00

**Exhibit 10**
**Order Approving Stipulation of Counsel (Case Caption)**

*Hughes-Blaum*
*Twer*
*11-2-17*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
William R. Hinchman, Esquire (I.D. No.: 60540)
Kelsey Hughes-Blaum, Esquire (I.D. No.: 322313)
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700



Case #: 2014-08576-0019   11745470
Code: 76      Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt Z1883912  11/3/2017 12:37:57 PM

*Attorneys for Defendant*

MINDY R. TWER and
HOWARD ABRAMS
　　　　　　　　　　　Plaintiffs,

　　v.

FOX CHASE BANK

　　　　　　　　　　　Defendant.

COURT OF COMMON PLEAS
BUCKS COUNTY

CIVIL ACTION

No. 2014-08576

<u>**PROPOSED STIPULATION TO AMEND CASE CAPTION**</u>

　　IT IS HEREBY STIPULATED AND AGREED by and between plaintiffs Mindy R. Twer and Howard Abrams ("Plaintiffs") and defendant Univest Bank & Trust Co., successor by merger to Fox Chase Bank ("Defendant"), through their undersigned counsel, that the case caption be amended to substitute "UNIVEST BANK & TRUST CO., successor by merger to Fox CHASE BANK" in place of "FOX CHASE BANK" as the named defendant in this matter.

KLEHR | HARRISON | HARVEY |
BRANZBURG LLP

By: _____
William R. Hinchman, Esquire
Kelsey Hughes-Blaum, Esquire
1835 Market Street, Suite 1400
Philadelphia, PA 19103
(215) 569-2700
*Attorneys for Defendant*

DAVID M. TWER & ASSOCIATES

By: _____
　　David M. Twer, Esquire
　　1234 Bridgetown Pike, Suite 200
　　Feasterville, PA 19053
　　(215) 953-7600
　　*Attorney for Plaintiffs*

APPROVED AND SO ORDERED
this _____ day of _November_, 2017

_____
**WALLACE H. BATEMAN, JR., JUDGE**

PHIL1 6561340v.1

**N.B.   It is your responsibility
to notify all interested parties
of the above action.**

Case# 2014-08576-16 - JUDGE:34  Received at County of Bucks Prothonotary Office on 10/27/2017 10:32 AM, Fee = $0.00

RECEIVED
2017 NOV -3 P 1:18
PROTHONOTARY
OF BUCKS COUNTY

OCT 3 1 2017

THIS ORDER/JUDGMENT WAS DOCKETED AND SENT ON 11/06/2017 PURSUANT TO PA. R. C.P. 236.

**Exhibit 11**
**Complaint**

*0*

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY
## CIVIL DIVISION

Mindy R. Twer, and
Howard Abrams

Plaintiff                                          :        No.___2014-08576_____

    vs.                                            :

Univest Bank & Trust Co., successor               :        _____

by merger to Fox Chase Bank                       :        **Form of Action**

                                                  :        _____Complaint_____

Defendant

### NOTICE

You have been sued in court. If you wish to defend against the claims set forth in the
following pages you must take action within twenty (20) days after this complaint and notice
are served by entering a written appearance personally or by attorney and filing in writing
with the court your defenses or objections to the claims set forth against you.  You are
warned that if you fail to do so the case may proceed without you and a judgment may be
entered against you by the court without further notice for any money claimed in the
complaint or for any other claim or relief requested by the plaintiff. You may lose money or
property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO
NOT HAVE A LAWYER OR CANNOT AFFORD ONE GO TO OR TELEPHONE THE
OFFICES SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Bucks County Bar Association
135 East State Street
Doylestown, PA 18901
Phone (215) 348-9413, 1-800-479-8585
www.bucksbar.org

PA Bar Association: www.pabar.org

David M. Twer, Esquire
_____

Attorney for____Plaintiffs_____

Attorney I.D. #____44044_____
Please type or print name and address

David M. Twer, Esquire
_____

1234 Bridgetown Pike, Suite 200

Feasterville, PA 19053

215-953-7600

Case #: 2014-08576-0020    11749477
Code: 46        Judge:34
Patricia L. Bachtle, Bucks County Prothonotary
Rcpt: Z1886913  11/13/2017 9:52:46 AM

RECEIVED
2017 NOV 13 A 9:22
PROTHONOTARY
OF BUCKS COUNTY



DAVID M. TWER, ESQUIRE
DAVID M. TWER & ASSOCIATES
1234 Bridgetown Pike
Suite 200
Feasterville, PA 19053
(215) 953-7600
Attorney I.D. #44044

Attorney for Plaintiffs

## IN THE COURT OF COMMON PLEAS OF BUCKS COUNTY, PENNSYLVANIA

| | | |
|---|---|---|
| Mindy R. Twer | : | |
| and | : | NO. 2014-08576 |
| Howard Abrams | : | |
| | : | |
| v. | : | |
| | : | |
| Univest Bank & Trust Co., successor | : | |
| by merger to Fox Chase Bank | : | |

RECEIVED
2011 NOV 13 A 9 22
PROTHONOTARY
OF BUCKS COUNTY

### CIVIL ACTION - COMPLAINT

1.  Plaintiff Mindy R. Twer herein a/k/a Mindy Twer (herein "Twer") is an adult individual residing at 17 Mayflower Circle, Holland, PA 18966.

2.  Plaintiff Howard Abrams (herein "Abrams") is an adult individual at all times relevant herein residing at 64 Timothy Drive, Ivyland, PA 18954.

3.  Fox Chase Bank (herein "Bank" or "the Bank") was at all times relevant herein a federal savings bank with a place of business at 815 Bustleton Pike, Richboro, PA 18954.

4.  On or about July 1, 2016 Bank was merged into Univest Bank & Trust Co (herein "Univest") and Univest became the surviving entity.

1

5.     Under applicable law, statute and otherwise, Univest is responsible and liable for any actions, debts, liabilities, and the kind that Bank would otherwise be responsible and/or liable.

6.     Univest is responsible and liable to Plaintiffs in the same manner and to the same extent as Bank was, or is, or both, as to the causes of actions and damages as alleged in this Complaint.

7.     On or about November 30, 2010, Fox Chase Bank, Henry Abrams (herein "Henry"), City Aluminum Corporation (herein "Cavco"), Howard Abrams, Beth Anne Abrams (herein "BA"), David Twer herein a/k/a/ David M. Twer (herein "DT"), and Mindy Twer (said Henry, Cavco, Abrams, BA, DT, and Twer herein collectively and/or singularly "Obligors") entered into a Modification Agreement, Forbearance Agreement and Deed in Lieu of Foreclosure Agreement (herein "Modification Agreement"), a true and correct copy of which attached hereto and made a part hereof as Exhibit "A."

8.     The background of the Modification Agreement was as set forth in the Background Section of the Modification Agreement, as might further be modified within the Modification Agreement, and said background shall be deemed as restated herein as if fully rewritten herein, and any defined term in said Background section when used in this Complaint shall have the same meaning as used in the Modification Agreement.

9.     Henry has assigned to Mindy R. Twer and Howard Abrams any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, he might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document

2

mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions he might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom.

   10. Cavco has assigned to Mindy R. Twer and Howard Abrams any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, it might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom. .

   11. BA has assigned to Howard Abrams any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, she might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or

3

related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions she might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom.

12.     DT has assigned to Mindy R. Twer any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, he might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions he might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom.

13.     City Alum LP II has assigned to Mindy R. Twer any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, it might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without

4

limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom (said City Alum LP II, and Mighty Max Development Corp, Venus LP, 1421 Spruce Street Limited Partners, Yenom Management Corporation, JAMD Partners referred to singularly and collectively herein as "Affected Entities").

14.     Mighty Max Development Corp has assigned to Mindy R. Twer any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, it might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom.

15.     Venus LP has assigned to Mindy R. Twer any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, it might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned

5

in and/or related to the Modification Agreement or arising as a result of the Modification

Agreement, and/or contemplated by the Modification Agreement, which includes without

limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors,

officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in

any manner related to or connected with any or all of the foregoing and includes without

limitation anything as averred in this Complaint and any settlements, judgements, or otherwise

granted therefrom.

16.    1421 Spruce Street Limited Partners has assigned to Mindy R. Twer any and all

claims, judgements, settlements and any other gains stemming in any manner from any matter,

whether through litigation, or not, it might have or will have against any person or entity related

in any manner and/or arising from the Modification Agreement and/or any loan, action, or

document mentioned in and/or related to the Modification Agreement or arising as a result of the

Modification Agreement, and/or contemplated by the Modification Agreement, which includes

without limitation any and all actions it might have against Fox Chase Bank, its shareholders,

directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for

anything in any manner related to or connected with any or all of the foregoing and includes

without limitation anything as averred in this Complaint and any settlements, judgements, or

otherwise granted therefrom.

17.    Yenom Management Corporation has assigned to Mindy R. Twer any and all

claims, judgements, settlements and any other gains stemming in any manner from any matter,

whether through litigation, or not, it might have or will have against any person or entity related

in any manner and/or arising from the Modification Agreement and/or any loan, action, or

6

document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom.

18.    JAMD Partners has assigned to Mindy R. Twer any and all claims, judgements, settlements and any other gains stemming in any manner from any matter, whether through litigation, or not, it might have or will have against any person or entity related in any manner and/or arising from the Modification Agreement and/or any loan, action, or document mentioned in and/or related to the Modification Agreement or arising as a result of the Modification Agreement, and/or contemplated by the Modification Agreement, which includes without limitation any and all actions it might have against Fox Chase Bank, its shareholders, directors, officers, agents, contractors, employees, insurers, accountants and/or attorneys for anything in any manner related to or connected with any or all of the foregoing and includes without limitation anything as averred in this Complaint and any settlements, judgements, or otherwise granted therefrom. .

19.    Twer and Abrams are the only current real parties in interest to all causes of action contained in this Complaint.

20.    At all time relevant herein, DT was the spouse of Twer.

21.    At all times relevant herein DT was neither an officer, director, individual

7

shareholder or employee of Cavco.

22.   At all time relevant herein, BA was the spouse of Abrams.

23.   At all times relevant herein BA was neither an officer, director, individual shareholder or employee of Cavco.

24.   At all times relevant herein, Bank's counsel in charge of Bank's engagement in connection with Loan 1 and Loan 2 in 2010 and thereafter (herein "Senior Counsel") and the law firm that he was a member and/or partner and all lawyers who were partners, members, associates, of counsel or otherwise of said law firm and all employees and independent contractors of said law firm (all of the foregoing including Senior Counsel singularly or collectively known herein as "Counsel") acted and performed at the direction and authority of Bank and as Bank's agent with Bank serving as principal.

25.   It was with the full knowledge of Bank and well known to Bank that the purpose of Loan 1 was to ultimately finance and refinance debt facilities related to or was the obligation of Cavco.

26.   Bank knew that the ultimate beneficiary of the funds funded by Bank for Loan 1 was Cavco.

27.   Bank entirely, mostly, or heavily relied upon the cash flow of Cavco to underwrite, grant and approve Loan 1, as evidenced by no less than the unconditional guarantee of Cavco and the debt service and performance covenants as contained within the Loan 1 documents.

28.   Bank accepted payments as billed by Bank for Loan 1 through August 31, 2010.

29.   Bank accepted interest payments as billed by Bank for Loan 2 for interest due through September 30, 2010.

8

30.    As stated in paragraph I and J of the Background section of the Modification Agreement, Bank's Senior Counsel on behalf of Bank sent certain notices of certain defaults on September 23, 2010 and such notices unilaterally gave Loan 1 Obligors and Loan 2 Obligors "thirty (30) days after receiving [the] written notice to cure the default."

31.    The notices as described in averment 30 further states that "[i]n the event such default is not cured within the above stated time period [ie, 30 days from receipt of the September 23, 2010 letters], then such default shall become an Event of Default entitling Bank to utilize the legal and equitable remedies available to it under the Note and the other Loan Documents against the Borrower and the Guarantors...."

32.    The notices as described in averment 30 were objectively, factually incorrect in manners that future discovery, evidence, and testimony may or will establish.

33.    Notwithstanding that by way of Bank's Senior Counsel's unilateral written declaration that Loan 1 Obligors had 30 days from receipt of the September 23, 2010 letter as aforementioned, Bank, through its same counsel, filed Complaints in Confession of Judgement with respect to Loan 1 against all Loan 1 Obligors, some on October 12, 2010 and some on October 13, 2013, well short of thirty (30) days of receipt of the September 23, 2010 aforementioned letter, the aforesaid filings being a matter of public record.

34.    DT's maximum liability under the Loan 1 Documents was One Million Dollars.

35.    Notwithstanding that DT's maximum liability under the Loan 1 Documents was One Million Dollars, the notices as described in averment 30 stated that he was liable for all of the obligations of Loan 1.

36.    Notwithstanding that DT's maximum liability under the Loan 1 Documents was

9

One Million Dollars, Bank confessed judgement against DT in the amount of $2,331,408.43.

37.   BA's maximum liability under the Loan 1 Documents was One Million Dollars.

38.   Notwithstanding that BA's maximum liability under the Loan 1 Documents was One Million Dollars, the notices as described in averment 30 stated that she was liable for all of the obligations of Loan 1.

39.   Notwithstanding that BA's maximum liability under the Loan 1 Documents was One Million Dollars, Bank confessed judgement against BA in the amount of $2,331,408.43.

40.   The Complaints and assessment of damages in the aforementioned confession of judgement packages were objectively, factually incorrect in manners that future discovery, evidence, and testimony may or will establish.

41.   The Bank verified and signed documents attached to the aforementioned Confession of Judgment packages that were known to them to be false.

42.   Bank's Senior Counsel signed the aforementioned Complaints in Confession of Judgement and in contradiction of Pa.R.C.P. 1023 signed same contrary to his demonstrated knowledge and belief, and his own previous writings.

43.   On or about October 15, 2010, DT, as principal and as counsel for Loan 1 Obligors and Loan 2 Obligors requested a meeting with the Bank and such meeting took place on October 19, 2010 in the executive conference room of the Bank.

44.   The October 19, 2010 was attended by Twer, DT, the COO of the Bank, a Sr. Vice President of the Bank, and two attorneys who represented the Bank.

45.   The purpose of the October 19, 2010 meeting was to try to resolve the issues between the Loan 1 Obligors, Loan 2 Obligors and the Bank, and there was much discussion for

10

several hours consistent with that purpose.

46.     Bank's Senior Counsel at the October 19, 2010 meeting was "very impressed" with DT's financial statement and although that was an innocent sounding statement at the time, it was ultimately unknown what implications that statement meant at the time and what Bank's ultimate ulterior illegal motives would evolve.

47.     DT's and Twer's backs were facing a television set up in the executive conference during the meeting on October 19, 2010 while all other participants had a clear frontal view of said television.

48.     During the October 19, 2010 meeting, the television in the conference room was on, with sound, and the participants except for Twer and DT whose net worth and lives were at risk during such meeting, were watching the live playoff game between the Philadelphia Phillies and the San Francisco Giants.

49.     Twer and DT discovered at the October 19, 2010 meeting that the Bank appraised the real estate collateral for the Loan 1 facility and its liquidation value was slightly under the principal amount due and its appraised value after being properly exposed to the market was at least as much or more than the principal balance due on the loan.

50.     The principal amount due on Loan 1 as of October 19, 2010 was $2,178,537.10

51.     At the time of the October 19, 2010 meeting the value of the Loan 2 portion of collateral consisting of furniture, fixtures, equipment and inventory was valued in excess of One Million Dollars while the principal balance of Loan 2 was only $318,122.77.

52.     Bank was an additional insured, loss payee, and mortgagee, as applicable on each of Loan 1 and Loan 2 and held a UCC-1 perfected security interest upon the insurance proceeds

11

therein.

53.     Bank's Senior Counsel contacted DT on October 20, 2010 and informed DT that Bank wanted to work with the Loan 1 and Loan 2 Obligors based upon the de minimis framework that was established on October 19, 2010 and although Bank's Counsel stated that he would have draft documentation within a few days, no first draft was forthcoming in such "few days."

54.     On October 25, 2010 at approximately 7:00 PM a fire blaze that ultimately turned into five alarms broke out upon the real estate collateral securing Loan 1 and the location that the furniture, fixture and equipment collateral of Loan 2 was housed in.

55.     It took three days for the fire to be put out, and the building at issue was totally destroyed together with the contents therein.

56.     The official cause of the fire was undetermined.

57.     The Bank was notified by DT of the fire the morning of October 26, 2010.

58.     Officers of the Bank visited the site of the fire several times during the week of October 25, 2010.

59.     By October 27, 2010, the City of Philadelphia deemed the subject property unsafe, condemned it,  and demanded that whatever was left of the burnt out building be imminently demolished.

60.     By the end of the week of October 25, 2010, the Bank's collateral position was valued at more than three times the amount owed to the Bank on Loan 1 and Loan 2 when considering the collateralized insurance proceeds and the value of the soon to be vacant land where the building once stood.

12

61.     The value of the combined collateral for Loan 1 and Loan 2 on October 28, 2010

was at least twice as much in value than at anytime previous during any time that Loan 1 and

Loan 2 was in existence.

62.     From October 28, 2010 through November 30, 2010 there were countless demands

made by Bank and subsequent modifications made by Bank to the ever evolving Modification

Agreement by Bank and Bank's Counsel.

63.     From October 28, 2010 through November 30, 2010 Bank and Bank's Counsel

continually increased the amount of documentation and ancillary due diligence as they

unilaterally required pursuant to the Modification Agreement.

64.     There were at least nine drafts of the Modification Agreement forwarded to or on

behalf of Obligors 1 and Obligors 2 before being executed.

65.     Each draft forwarded to or on behalf of Obligors 1 and Obligors 2 was sent with a

caveat that it was subject to the review and approval of Bank and was also forwarded to Bank.

66.     It is unknown as of the drafting of this compliant if any versions or drafts were

forwarded to Bank that Obligors 1 or Obligors 2 were not made privy to.

67.     DT never applied for any further credit after 2007 with Bank by way of application

or joint application with or on behalf of any other applicant.

68.     BA never applied for any further credit after 2007 with Bank by way of application

or joint application with or on behalf of any other applicant.

69.     While having a collateral value of at least two times greater than it did prior to

October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2

combined, Bank demanded more collateral from Twer and Abrams in the form of the Additional

13

Hagert Street Properties as defined in the Modification agreement which was then valued at approximately $120,000.00.

70.　　While having a collateral value of at least two times greater than it did prior to October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2 combined, and the additional collateral as described in averment 69 hereof, Bank demanded more collateral and conveyance documents from  from Loan 1 Obligors and Loan 2 Obligors, as applicable, in the form of demanding the Loan I Obligors and Loan 2 Obligors to "cause" the owner of certain Bucks County Properties as defined in the Modification Agreement, to sign original deeds, bills of sale and other customary real estate conveyances for the Bucks County Properties as defined in the Modification agreement which was then known to Bank to be valued, on net,  at more than $758,000.00.

71.　　DT had a beneficial interest in the Bucks County Properties.

72.　　BA had a beneficial interest in the Bucks County Properties.

73.　　City Alum LP II owned the Bucks County Properties.

74.　　The sole General Partner of City Alum LP II was Mighty Max Development Corp, an entity solely owned and controlled by DT.

75.　　While having a collateral value of at least two times greater than it did prior to October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2 combined, and the additional collateral as described in averments 69 and 70 hereof, Bank demanded "as additional security" for Abrams, Twer, DT and BA to cause City Alum LP II to grant to Bank four additional mortgages for the Bucks County Properties known in the Modification Agreement as Bucks County Mortgages.

14

76.     When Bank's Senior Counsel was confronted by DT with the prospect that City
Alum LP II could not timely or at all get any prior lender's consent for such Bucks County
Mortgages, his response was City Alum LP II should just grant the mortgages as that is what
every borrower is doing who is "up against the wall."

77.     While having a collateral value of at least two times greater than it did prior to
October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2
combined, and the additional collateral as described in averments 69, 70, and 75 hereof, Bank
demanded that Henry execute and deliver to Bank a stipulation confirming that Henry did not
have any defense to the action in foreclosure that Bank was to file a praecipe for on or about the
date of execution of the Modification Agreement.

78.     While having a collateral value of at least two times greater than it did prior to
October 25, 2010 and at least three times the principal balances of Loan 1 and Loan 2 combined,
and the additional collateral as described in averment 69, 70 and 75 hereof, Bank demanded that
DT grant Bank a collateral assignment of his ownership interest in 1421 Spruce Street Limited
Partners which was then known by Bank to be valued at approximately $282,150.00.

79.     While the applicable limited partnership agreement did not allow DT to unilaterally
assign his interest in said 1421 Spruce Street Limited Partners, Banks's Counsel's response to
this limitation was to just do it as  that is what every borrower is doing who is "up against the
wall."

80.     While having a collateral value of at least two times greater than it did prior to
October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2
combined, and the additional collateral as described in averment 69, 70, 75, and 78 hereof, Bank

15

demanded that DT grant Bank a collateral assignment of his ownership interest in Venus LP which was then valued at $1,236,750.00.

81.    While the applicable limited partnership agreement did not allow DT to unilaterally assign his interest in said Venus LP, Banks's Counsel's response to this limitation was to just do it as that is what every borrower is doing who is "up against the wall."

82.    While having a collateral value of at least two times greater than it did prior to October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2 combined, and the additional collateral as described in averment 69, 70, 75, 78, and 80 hereof, Bank demanded that DT grant Bank a collateral assignment of his ownership interest in Mighty Max Development Corp which was then known by the Bank to be valued at $84,100.00.

83.    While the applicable limited partnership agreement did not allow DT to unilaterally assign his interest in said Mighty Max Development Corp, Banks's Counsel's response to this limitation was to just do it as that is what every borrower is doing who is "up against the wall."

84.    While having a collateral value of at least two times greater than it did prior to October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2 combined, and the additional collateral as described in averment 69, 70, 75, 78, 80, and 82 hereof, Bank demanded that DT deliver to Bank a $100,000.00 Confession of Judgement Note and draw from JAMD Partners, an entity which DT controlled, $100,000.00 of First Priority Bank Stock to pledge to Bank under the Modification Agreement.

85.    While the applicable partnership understanding did not allow DT to unilaterally withdraw anything as his own from said JAMD Partners, Banks's Counsel's response to this limitation was to just do it as that is what every borrower is doing who is "up against the wall."

16

86.     While having a collateral value of at least two times greater than it did prior to

October 25, 2010 and more than three times the principal balances of Loan 1 and Loan 2

combined, and the additional collateral as described in averment 69, 70, 75, 78, 80, 82, and 84

hereof, and Bank held, or was to hold, Deeds and Mortgages for the properties owned by City

Alum LP II, the Bucks County Properties, and a collateral assignment of the sole general partner

of City Alum LP II, in effect controlling City Alum LP II, the Bank demanded that Twer,

Abrams, BA and DT grant Lender a collateral assignment of their interests in City Alum LP II

which was then valued at approximately $758,000.00.

87.     Univest has, or should have, knowledge of all events and facts as averred in this

Complaint and possesses all documentation, notes, memorandums, emails, facsimiles,

correspondence, and evidence related in any manner to Loan 1, Loan 2, the Modification

Agreement and anything averred in this Complaint in the same manner as did The Bank.

88.     Yenom Management Corporation was at all times relevant herein the sole General

Partner of both Venus LP and 1421 Spruce Street Limited Partners.

89.     DT was at times relevant herein the sole shareholder and exclusively controlled

Yenom Management Corporation.

90.     Bank and Bank's Counsel coerced DT to act on behalf of Yenom Management

Corporation in manners that were not otherwise prudent, except for being under duress

unnecessarily and unreasonably caused by Bank, and said manners were outside of contract

provisions Yenom Management was bound to with third parties.

91.     All totaled, after lawfully having the original collateral for the original Loan 1 and

Loan 2 of the land and the insurance proceeds of approximately $7,400,000.00 the bank

17

demanded and received additional collateral of greater than $3,219,000.00 for total collateral in

excess of $10,619,000 to secure a principal balance on both Loan 1 and Loan 2 of $2,496,659.87,

in addition to having the unsecured guarantees of 5 individuals and one entity worth at least at

the time in combination of in excess of an additional $7,000,000.00, excluding any insurance

proceeds or assets related to Loan 1 and Loan 2.

92.    Bank was in a far superior situation and held a far superior collateral position on

October 26, 2010 than it ever did at any time previous to that with regard to Loan 1 and Loan 2.

93.    Despite Bank's superior situation and collateral position as aforementioned, in

modifying Loan 1 and Loan 2 by way of the Loan Modification, Bank demanded BA, a non

shareholder, non officer and non director of Cavco, the known benefactor to the Bank of Loan 1

and the borrower in Loan 2, but said BA being a spouse of one of the shareholders, directors and

officers of CAVCO, to pledge additional collateral, whereas there was no pledge by her before

the Modification Agreement and in effect be an additional guarantor to Loan 2, a loan she was

not a guarantor to before the Modification Agreement by drafting, effecting and demanding the

cross collateralization and cross default provisions as contained in the Modification Agreement.

94.    Despite Bank's superior situation and collateral position as aforementioned, in

modifying Loan 1 and Loan 2 by way of the Loan Modification, Bank demanded DT, a non

shareholder, non officer and non director of CAVCO, the known benefactor to the Bank of Loan

1 and the borrower in Loan 2, but said DT being a spouse of one of the shareholders, directors

and officers of CAVCO, to pledge additional collateral where there was none before the

Modification Agreement, in excess of his limited guarantee on Loan 1 and in effect be an

additional guarantor to Loan 2, a loan he was not a guarantor to before the Modification

18

Agreement by drafting, effecting and demanding the cross collateralization and cross default provisions as contained in the Modification Agreement.

95.     On October 30, 2009, Cavco, with the acquiescence and permission of Bank, sold certain assets for $250,000.00 and turned over said $250,000.00 in full to Bank to pay down Cavco's loan (Loan 2) to bank.

96.     Bank failed for at least nine months to account or apply said $250,000.00 to any loan as to Obligors 2, or even Obligors 1.

97.     Sometime in or about August 2010, Bank finally applied the $250,000.00 as it unilaterally saw fit without consultation with either Obligors 1 or Obligors 2, and applied the funds in various manners to both loans of Obligors 1 and Obligors 2.

98.     Bank failed to in good faith, or any faith, timely account to Obligors 1, Obligors 2, or any of them as to the application of the aforesaid $250,000.00 of proceeds.

99.     Bank failed as to its fiduciary duty by not timely accounting to Obligors 1 , Obligors 2, or any of them as to the application of the aforesaid $250,000.00 of proceeds.

100.     Abrams, Twer, DT and BA had business interests outside of the businesses that were connected with Loan 1 and Loan 2 ("Outside Business Interests") when said loans were originated, and such Outside Business Interests were independent or not connected with the businesses associated with Loan 1 and Loan 2.

101.     Bank intentionally and without any regard to the rights of Abrams, Twer, DT and BA wrongfully put Abrams, Twer, DT and BA in technical default of certain credit arrangements they had concerning the Outside Business Interests.

102.     Bank sought and achieved greater control over certain aspects of the Outside

19

Business Interests from a far more junior position, or even no position, than the creditors of the Outside Business Interests.

103.    DT and Twer had outside business interests ("Twer Outside Business Interests") for which towards the end of December 2010 millions of dollars of credit was eminently ballooning and subject to renewal, and would have gotten readily renewed but for Bank's wrongful actions and wrongful judgements placed against Twer and DT.

104.    There was logistically not enough time for Twer and DT to strike Bank's judgements against them, which with all probability could have been achieved in due course based upon Bank's filings.

105.    Twer's and DT's only plausible and practical course of action, while mitigating damages, was to "play ball," no matter how unreasonable and draconian the Bank unilaterally made the rules of the game, as Bank in fact actuality did, in an effort to release the judgements against them with Twer's and DT's full knowledge that insurance proceeds of approximately twice the principal balance owed to the Bank would most likely be forthcoming within the forbearance period as dictated by the Modification Agreement, let alone any other method available to Obligors 1, Obligors 2, or any of them, that funds could be raised to satisfy Bank.

106.    The Modification Agreement was an adhesive writing solely drafted and dictated by Bank notwithstanding anything stated therein, and such anything else stated therein is in itself adhesive as Bank would not allow it to be modified.

107.    The far majority of the documentation and demands of Bank and Bank's Counsel during all relevant times after October 27, 2010 was unreasonable and unnecessary in light of the circumstances and the amount of collateral already available to Bank prior to the execution of the

20

Modification Agreement.

108.    Within approximately ten (10) days of October 25, 2010, Loan 1 Obligors

successfully negotiated with their insurance carrier to advance $500,000.00 towards demolition

costs for the Property, said demolition costs to ultimately be ever so slightly in excess of this

advance.

109.    The said $500,000.00 demolition advance was to be made payable to Bank and

Cavco and Henry.

110.    The contract for the demolition, which Bank was privy to, called for an initial

deposit of $100,000.00 with there being progress payments thereafter.

111.    While DT discussed with Senior Counsel as to how Senior Counsel  wanted to

logistically handle this, Senior Counsel was insistent that the entire $500,000.00 be signed over

to the demolition company before they even demolished the first brick.

112.    To pay the demolition company anything more than contractually required at

contractually required times, let alone $500,000.00 before the job even commenced, no matter

how reputable the demolition company might be, is commercially not acceptable, not reasonable,

and just irresponsible.

113.    For the Bank to demand that the demolition company be paid the $500,000.00 up

front without performing any work is a breach of fiduciary responsibility on the part of the Bank.

114.    For the Bank to demand that the demolition company be paid $500,000.00 up

front without performing any work is a breach of fiduciary duty and thus a creation of lender

liability on the part of the Bank.

115.    Much time and legal time was spent discussing and "arguing" over the foregoing

21

demolition advance with Bank's Counsel before Bank eventually and ultimately saw the light and agreed to escrow the $500,000.00 with a third party who would and did make appropriate progress payments to the demolition company.

116.    DT requested of Bank's Senior Counsel many times between October 2010 and December 13, 2010 what the hourly rates of the several attorneys working on this matter was and what the monetary status of the bill was.

117.    DT received no direct, or for that matter indirect answers to his inquiries as addressed in averment 116 hereof, to the point that not even Bank's Senior Counsel, the partner in charge of the engagement, would disclose his own hourly rate to DT.

118.    The closest answer to objectivity that DT would hear from Senior Counsel is that his rates are "reasonable," which was far away from the specifics and particularities of what the inquiries actually were.

119.    One response that DT did receive from Bank's Senior Counsel on several occasions is that his retainer letter provides that the legal bill to Bank is discounted by twenty percent (20%).

120.    Loan 1 and Loan 2 Borrowers are potentially liable to pay for certain **reasonable** [emphasis added] attorney fees and costs of Bank.

121.    Twer requested from an officer of Bank an accounting of the legal fees to date on or about December 8, 2010, and Bank officer had no knowledge as to what any fees were.

122.    On December 13, 2010, for the very first time, Bank's legal fees and costs as alleged by Bank's Counsel, were revealed to DT, which included time since August 2010.

123.    Despite numerous demands by DT for the legal fees and costs, if Obligors 1 and

Obligors 2 were responsible for same, and even knew these fees and costs went back to August 2010, the bills were not forthcoming which is an indication as was contemporaneously alleged by DT at the time that the fees and costs were just being "made up" and manufactured when they had to be made up.

124.    In addition to the entire legal engagement being more than over lawyered, unnecessary under the circumstances, and unreasonable, the bills contained numerous and many instances of unreasonable use of legal time and or time not reasonable, the bills were unreasonable, and there were line items that were not the obligation of Obligors 1 or Obligors 2 to pay on behalf of Bank or reimburse to the Bank in manners and matters that future discovery, evidence, and testimony may or will establish.

125.    Bank's Counsel was at many times "absent minded," or inattentive, or both, and the same issue(s) had to be visited and revisited numerous times requiring more and more time which is unreasonable legal time and fees.

126.    There were even "out of pocket" charges contained in the legal bills at issue that Bank and Bank's Counsel admitted were never expended.

127.    Bank's Counsel stated that he would supply at no charge a notary for the signing of the voluminous unnecessary documents, let alone the reasonable documents, that he drafted in connection with the Modification Agreement and which took approximately four hours to sign.

128.    Notwithstanding the no charge for a notary as aforementioned, there was a charge of 5.5 hours for the free notary, who is an employee of Bank's Counsel on Bank's Counsel's legal bill.

129.    Obligors 1 and Obligors 2 and other parties in connection with same did not

23

require any assistance or time from Bank's Counsel to sign the voluminous documents, albeit at

least two of Bank's lawyers and at least one additional Bank law firm personnel was in

attendance during the aforementioned four hour signing.

130.    In preparation for the aforementioned four hour signing, Bank's Counsel took the

unilateral liberty of color coding with marker tabs each and every signature line where each and

every Obligor1, Obligor 2 and Affected Entity needed to sign on the voluminous documents, and

billed to do same.

131.    The unrequested marking of the documents provided no benefit to the Obligors 1,

Obligors 2, or each Affected Entity due to the fact that DT, who was in charge of getting

Obligors 1, Obligors 2 and each Affected Entity to sign each and every document in the right

place is color blind, and as such, the marker tabs were of no value, DT was and is still is capable

of turning the pages of a document and determining where signatures are required without

marker tabs, and such exercise of color coding the signatures only benefitted Bank's law firm so

that they could bill for same no matter how unreasonable such billing might be.

132.    Bank's Counsel brought numerous other attorneys and staff into the review and

drafting of the documents associated with Modification Agreement whose time was reflected on

the bills.

133.    The other attorneys as aforementioned were among other issues as future

discovery, evidence, and testimony will or may establish, were put on Bank's Counsel's clock to

opine and give opinions on preexisting partnership documents, preexisting and new UCC-1's

that were related and not related to the overkill of documentation , unnecessary collateral as

aforementioned, assignment documents that were overkill, unnecessary and unreasonable as

24

aforementioned, most or all such opinions being moot because Obligors 1 and Obligors 2 could only deliver what was in existence and nothing more; in addition to other lawyers who were consulted by The Bank for lender liability issues as Bank's Counsel was made aware that Bank was at the doorstep, if not through the door, on that issue; all of the foregoing being unreasonable legal time and thus billings vis a vis from The Bank's standpoint making Obligors 1 and Obligors 2 liable for same.

134.    The legal bills at no time ever reflected the twenty percent discount, as aforementioned, or any discount as aforementioned in this Complaint.

135.    When DT questioned in person on December 17, 2010 Bank and Bank's Senior Counsel why the twenty percent discount was not showing, Bank's Counsel knowing that there were numerous other issues that Obligors 1 and Obligors 2 had with Bank, as evidenced by this Action and Complaint, simply replied that if Obligors 1 and Obligors 2 settled all of these other issues right there and then, they would reduce the legal bills on that day by said twenty percent.

136.    DT's response to Bank's Counsel's statement in averment 135 was why would Obligors 1 and Obligors 2 give up their litigation rights to millions of dollars of damages in return for $17,000 more or less of a discount that Bank's Counsel was in any event contractually obligated to credit Bank, and in turn Bank was in a fiducial capacity and contractually obligated to seek and pass on to Obligors 1 and Obligors 2.

137.    Bank's Counsel's and Bank's actions or lack of actions regarding discounting of the legal fees are consistent with acts of fraud and blackmail and is furthermore consistent with their overall heavy handed tactics as aforementioned in this Complaint.

138.    To the best of the knowledge and belief of Obligors 1 and Obligors 2 and based

25

upon the information presented to them by Bank and Bank's Counsel, Bank was never billed by their Counsel for attorneys fees and costs.

139.    Any and all bills presented to Obligors 1 and Obligors 2 were copies of bills presented and addressed solely to Jerry Holbrook, individually, without any indication of any title or employer,  and not Fox Chase Bank.

140.    Apparently, Bank and Jerry Holbrook expected Obligors 1 and Obligors 2 to pay legal fees and expenses billed to Jerry Holbrook and that were apparently his responsibility.

141.    Bank had a fiduciary duty to Obligors 1 and Obligors 2 to monitor and oversee the legal fees and expenses.

142.    Bank failed and thus breached their fiduciary duty to Obligors 1 and Obligors 2 to monitor and oversee the legal fees and expenses.

143.    Bank had a contractual duty to Obligors 1 and Obligors 2 to monitor and oversee the legal fees and expenses.

144.    Bank failed and thus breached their contractual duty to Obligors 1 and Obligors 2 to monitor and oversee the legal fees and expenses.

145.    Bank had a fiduciary duty to only bill Obligors 1 and Obligors 2 for reasonable attorney fees and costs or request reimbursement for same.

146.    Bank failed and thus breached their fiduciary duty to Obligors 1 and Obligors 2 to bill them or request reimbursement for only reasonable attorney fees and costs.

147.    Bank had a contractual duty to bill Obligors 1 and Obligors 2 for reasonable attorney fees and costs or request reimbursement for same.

148.    Bank failed and thus breached their contractual duty to Obligors 1 and Obligors 2

to bill them or request reimbursement for only reasonable attorney fees and costs.

149.    On or about December 9, 2010 DT requested a complete and total payoff statement for each of Loan 1 and Loan 2 from Bank to be effective for a "payoff meeting" either on December 17, 2010 or December 20, 2010.

150.    The request for a payoff statement came as a complete and total shock and surprise to Bank and Bank's Counsel.

151.    A payoff meeting was required as the Modification Agreement required Bank as stated therein (as Lender) to at such time Loan 1 Obligors and Loan 2 Obligors **paid** [emphasis added] all principal due under both Loan 1 and Loan 2 and all of Lender's reasonable attorney fees, plus other costs as further stated in the Modification Agreement as follows: "Lender shall execute any documentation necessary to release all collateral regarding such collateral, including all documents held in escrow, to Loan 1 Obligors and Loan 2 Obligors, as applicable," with time being deemed of the essence to such requirement, and the only practical way to logistically accomplish the foregoing was to have a live, in person, meeting and exchange.

152.    Notwithstanding that Bank's Senior Counsel in his pompous and condescending manner on November 30, 2010 at the execution of the Modification Agreement stated in his office that he would welcome to hold this payoff meeting at DT's office, his words were meaningless, as at that time he did not contemplate a meeting of this type (as he insinuated that Loan 1 and Loan 2 would never voluntarily be paid off which apparently there was an overall grand plan of conspiracy of Bank and Bank's Counsel to profit by owning all of the collateral that Bank took an interest in as aforementioned), and certainly not one in such short order, and when the time came in less than two short weeks later, Senior Counsel backtracked and stated

27

that there would be no meeting in DT's office, no meeting was even required (Senior Counsel probably did not want to show his face as Senior Counsel's and Bank's conspiracy scheme failed and failed quickly), and with Senior Counsel's presumption that it was a payoff from insurance company proceeds which was never stated one way or the other to the Bank, Bank's Senior Counsel stated that the proceeds could just be made out to the Bank only and he would pick them up at the offices of the carrier located in Philadelphia.

153.    The facts, statements and perception of Bank's Counsel as stated in averment 152 was clearly not what was required and dictated by the Modification Agreement that Bank's Counsel unilaterally drafted.

154.    Bank's Counsel did intentionally interfere with the contractual relations between Obligors 1 and Obligors 2, and their insurance carrier by personally appearing at the office of the insurance carrier in an attempt to walk out with a check made out only to the Bank, but Bank's Counsel was properly denied same by the insurance carrier.

155.    While it is customary, usual, and the signer of this Complaint who has been involved with payoff statements for more than 40 years has never seen a loan payoff statement prepared by any person or entity, other than the Bank directly when a bank is involved, in this matter, after many strong demands, two different payoffs statements prepared by Bank's Counsel generating unreasonable legal fees were eventually delivered to Obligors 1 and Obligors 2 late in the day on December 13, 2010.

156.    Together with the payoff statements as discussed in averment 155, Bank's Senior Counsel finally sent copies of the long awaited and many times requested legal bills for which Bank still had no knowledge of how much they were, and notwithstanding how unreasonable

28

they were.

157.    Throughout the week of December 13, 2010, there was little or no agreement

between Bank's Counsel, Bank, and Obligors 1 and Obligors 2 on anything including where a

meeting was to take place and if Bank would attend.

158.    Paragraph 4.C. of the Modification Agreement states as follows:

> If Loan 1 Obligors and Loan 2 Obligors pay all principal due under both Loan 1
> and Loan 2 and all of Lender's reasonable legal fees, plus the costs of any
> appraisals, title commitments, title policies and other materials reasonably
> required by Lender on or before December 31, 2010, Lender shall forgive all
> contractual interest and default interest due under Loan 1 and Loan 2. **All interest
> collected by the Lender** [emphasis added] shall be re-applied to the reduction of
> principal and shall be forgiven upon the payment of all principal due under Loan 1
> and Loan 2 and all of Lender's attorneys fees and costs as referenced above. **At
> such time** [emphasis added], Lender shall execute any documentation necessary
> to release all collateral owned by Loan 1 Obligors and Loan 2 Obligors and return
> all applicable documentation regarding such collateral, including all documents
> held in escrow, to Loan 1 Obligors and Loan 2 Obligors, as applicable.

159.    Said Paragraph 4.C. of the Modification Agreement as drafted by Bank and

reviewed by Bank on at least 9 different drafts is clear for what it stands for, is clear that in light

that it was before December 31, 2010 all interested collected by the Bank (ie Lender), without

regard as to when it was collected (and there was no further interest to contractually collect prior

to December 31, 2010 pursuant to the Modification Agreement) was to be reapplied to the

reduction of principal due under Loan 1 and Loan 2, without exception.

160.    Bank's Senior Counsel's response to this which is nothing but fraud and

misrepresentation was that said paragraph of the Modification Agreement "only applies to

interest due that has not been paid," which under any reading and interpretation is implausible

and impossible as Bank's Counsel's own drafting speaks to "all interest **collected**," [emphasis

added] without any regard to any limit as to when it was collected, not "due."

161.    Bank was the dominant and  major subsidiary of a publically traded entity that had

to produce satisfactory financial statements to support its stock price, ultimately appease its

shareholders, and seek or attract potential suitors to "cash out" their holdings at a premium, as

they ultimately achieved with Univest and were in talks, regarding same, with others before

Univest.

162.    The board of directors of The Bank and its parent had to appease shareholders to

maintain their position as board members.

163.    Of the many rewards of being a board member of the Bank and its parent was

compensation, availability of stock options, and the ultimate expected and sought combination

with another entity to realize further economic gain.

164.    The officers of The Bank, and particularly its highest ranking officers such as the

Bank's COO had to appease shareholders and ultimately The Bank's and the Bank's parent's

board of directors to maintain their positions with The Bank.

165.    Of the many rewards of being a high level Officer of the Bank was high

compensation, availability of stock options, golden parachutes in the event of a change of

control, and the ultimate expected and sought combination with another entity to realize further

economic gain.

166.    The COO of the Bank held a heavy and mighty hand and wielded a large sword in

the activities and occurrences as averred in this Complaint and concerning Loan 1 Obligors, Loan

2 Obligors and the Affected Entities.

167.    The Bank and it's parent's shareholders and its officers had major reasons to get

30

Loan 1 and Loan 2 off of its financial books by the end of December 2010 as if same were to

occur it would not negatively impact The Bank's end of quarter and end of year income and

financial statements, and thus not negatively impact its shareholders and potential suitors.

168.    Bank was supervised by and monitored by regulators.

169.    Bank had major reasons to get Loan 1 and Loan 2 off of its financial books by

December 31, 2010 and not have Loan 1 and Loan 2 negatively rated in any way upon its

financial books.

170.    In an effort for The Bank to fulfill its aforementioned major reasons and

accomplish its aforementioned goals, Bank incentivized Obligors 1 and Obligors 2 to find a way

to pay off Loan 1 and Loan 2 by offering the principal reduction incentive of Paragraph 4.C. of

the Modification Agreement in an effort to accomplish Bank's financial reporting and regulatory

goals.

171.    The amount of incentive that Paragraph 4.C. of the Modification Agreement

afforded was consistent with and probably less generous than other loans in the same status as

Loan 1 and Loan 2 at the same general time period in the same marketplace as the Bank, or even

with the Bank itself.

172.    Detrimentally relying upon the incentive that Paragraph 4.C. of the Modification

Agreement afforded, Loan 1 Obligors and Loan 2 Obligors entered into marathon and intense

negotiations with the applicable insurance company and agreed upon a settlement with them that

was less than said Obligors could have achieved given more time to achieve same and the

institution of potential litigation.

173.    Up to and including the filing of this Complaint, Bank has failed to perform its

31

contractual obligation to reapply all interest collected to the reduction of principal as aforementioned.

174.     Up to and including the filing of this Complaint, Bank has breached its fiduciary duty by failing to reapply all interest collected to the reduction of principal as aforementioned while inducing Obligors 1 and Obligors 2 to actually act in full to make and fulfill all of the payments and prerequisites as required by paragraph 4.C. of the Modification Agreement to the detriment of Obligors 1 and Obligors 2  and all of the while Bank apparently by its actions, or lack of actions, had no intention of fulfilling Bank's obligation to Obligors 1 and Obligors 2 thereunder.

175.     The amount of all interest collected by Bank for both Loan 1 and Loan 2 is $551,584.48, such information which both Bank and Univest having at least as equal access to as Plaintiffs.

176.     The amount of contractual interest collected by Bank for Loan 1 and Loan 2 is $551,584.48, such information which both Bank and Univest having at least as equal access to as Plaintiffs.

177.     A meeting did take place on December 17, 2010 in Bank's executive conference room with the attendees being Bank's Counsel, Bank's COO, Bank's Senior Vive President, DT and Twer.

178.     On December 17, 2010, at the same meeting as described in averment 177 hereof, Obligors 1 and Obligors 2 conditionally tendered $2,576,263.59, which Bank accepted, the exact combined amount as Bank's Counsel stated in the payoff statements referred to in averment 155 hereof, in the form of a check written by a  recognized insurance carrier rated A- by Best and

having a publically available balance sheet containing $900,000,000.00 of cash and invested

assets, for which in excess of $100,000,000.00 was available in the account it was drawn upon

for which the Bank unilaterally and independently confirmed during said meeting that the funds

were good funds during the in person tender, as dictated by Bank and its Counsel,

notwithstanding that the Modification Agreement had no explicit requisite of or for same (ie

good funds), albeit there was a good faith requirement of and for same.

179.    In any event, the aforementioned $2,576,263.59 was in all respects good funds

and were never anything other than good funds.

180.    The funds were endorsed to Bank as follows:

> Pay to the Order of Fox Chase Bank with reservation of rights,
> without prejudice, under protest and pursuant to letter dated
> 12/14/10 and all emails from D. Twer, Esq. To D. Giles, Esq.

181.    Amongst other conditions in the aforementioned 12/14/10 letter, it stated:

> Of course, as you are aware, while the funds are being tendered
> under protest, duress, without prejudice, and with each and every
> Obligor reserving full rights; without in any way being fully inclusive, there are
> unresolved issues regarding the necessity and/or reasonableness of the legal fees
> incurred and that are being demanded by Fox Chase Bank and the refusal of Fox
> Chase Bank to recognize all of its obligation to the Borrowers and Obligors under
> Paragraph 4.C. of the Modification, Forbearance Agreement and Deed in Lieu of
> Foreclosure Agreement dated November 30, 2010, together with other issues.

and further stated,

> The tender of such funds is in no way any acquiescence by the Obligors that any
> payoff letter generated by Fox Chase Bank or its attorney or any other funds are
> accurate or agreed upon and said Obligors specifically disagree with same.

182.    On December 17, 2010 Senior Counsel prepared an additional bill for legal fees

and costs again addressed to Jerry Holbrook and again which was not reasonable and again it was

33

expected of Bank that Obligors 1 and Obligors 2 pay for Jerry Holbrook's legal bill, which

Obligors 1 and Obligors 2 tendered to Bank at the December 17, 2017 meeting in the form of a

bank cashier's check in the amount of $6,582.61 which Bank accepted and was endorsed as

follows:

> Paid to the Order of Fox Chase Bank with reservation of rights
> without prejudice, under protest and pursuant to letter dated
> 12/14/10 and all emails from D. Twer, Esq. To D. Giles, Esq.

183.    Notwithstanding that the Modification Agreement clearly states in paragraph 4.C.

thereto that "at such time" that the principal as discussed and all Lender's attorney fees and costs

were paid, Bank shall execute any documentation necessary to release all collateral and return all

applicable documentation regarding such collateral including all documents held in escrow to

Obligors, Bank refused to so and failed to do so to the great detriment of Obligors 1 and Obligors

2

184.    Apparently Bank no longer liked the concept of "upon the payment," as it

unilaterally drafted in the Modification Agreement and which was reviewed by Bank through at

least nine drafts, and when required to act and perform upon the language Bank wished it could

change the language to something similar to upon the clearing of the funds, or the kind, which

the Modification Agreement failed to state or address.

185.    In an effort to mitigate damages, a different arrangement of questionable

enforceability was hastily and reluctantly entered upon, the documentation called for by the

Modification was not executed or delivered to Obligors 1 and Obligors 2 , and  Bank again

refused to timely perform upon the new arrangement which required performance upon the

"clearing" of the applicable funds, said clearing anticipated to occur in one to two business days

34

as in reality did indeed occur, however Bank did not perform until December 30, 2010 causing

Obligors 1 and Obligors 2 further harm and expense.

186.    As specified in this Complaint, Bank's actions smack of intentional wrongdoing.

187.    As specified in this complaint, Bank's misconduct was explicit, fraudulent,

malicious, and prompted by the sinister intention of one acting in bad faith.

188.    As specified in this Complaint, Bank engaged in unconscionable conduct.

189.    As specified in this Complaint, Bank engaged in arbitrary conduct.

190.    As specified in this Complaint, Bank acted intentionally and deliberately.

191.    As specified in this Complaint, Bank engaged in vexatious conduct.

192.    As specified in this Complaint, Bank made representations of fact that were false

and material for which Bank had knowledge of the false facts and /or were ignorant of its truths

for which Bank had expectations that Obligors 1 and Obligors 2 would act and did act in

ignorance of the falsity while relying upon Bank's representations, while Obligors 1 and Obligors

2 relied upon Bank while incurring consequent and proximate damages.

193.    Loan 1 Obligors and Loan 2 Obligors were acting under duress.

194.    There was unequal bargaining power between the Bank and Obligors 1 and

Obligors 2.

195.    The far majority, if not all, of the concepts and clauses as contained in the

Modification Agreement were not negotiable and that Bank's Counsel would not even discuss to

negotiate and were "take it or leave it."

196.    The Bank negatively impacted, affected and caused damages to the Affected

Entities as specified in this Complaint and in manners that future discovery, evidence, and

testimony may or will establish.

197.    The Bank gained an unconscionable advantage over Obligors 1 and Obligors 2 by abusing them.

198.    The Bank controlled Obligors 1 and Obligors 2 and the Affected Entities.

199.    The Bank dominated Obligors 1 and Obligors 2 and the Affected Entities

200.    Obligors 1 and Obligors 2 imposed confidences and trust in The Bank.

201.    The Bank had an obligation to deal in good faith which it failed to do.

## COUNT 1

202.    The averments in paragraphs 1 through 201, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

203.    The Bank has refused and continues to refuse to forgive and re-apply to the reduction of principal all interest collected by the Bank upon Loan 1 and Loan 2 although all preconditions of Paragraph 4.C. of the Modification Agreement were performed by Obligors 1 and Obligors 2.

204.    No person or entity on behalf of The Bank has forgiven and re-applied to the reduction of principal all interest collected by the Bank upon Loan 1 and Loan 2 although all preconditions of Paragraph 4.C. of the Modification Agreement were performed by Obligors 1 and Obligors 2.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of $551,584.48 together with applicable interest, costs of suit, and attorney's fees.

## COUNT II

205.    The averments in paragraphs 1 through 204, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

206.    The Bank accepted funds totaling $86,186.33 for attorney fees and costs and otherwise from Obligors 1 and Obligors 2 subject to reservation of rights, without prejudice, under duress, under protest and subject to other contingencies, with Bank fully knowing, aware, and on notice that the funds tendered were going to be challenged by  Obligors 1 and Obligors 2.

207.    The funds mentioned in averment 206 were wrongfully extorted, or at the very least, wrongfully demanded from Obligors 1 and Obligors 2 for as among other reasons that future discovery, evidence, and testimony may or will establish, the funds were for unreasonable fees, unnecessary fees, for fees that were not discounted consistent with the representations of Senior Counsel, and for fees billed to somebody other than The Bank.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of $86,186.33 together with applicable interest, costs of suit, and attorney's fees.


## COUNT III

208.    The averments in paragraphs 1 through 208, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

209.    The Bank failed to deliver the releases of collateral and documents required of it pursuant to and in accordance with the Modification Agreement.

210.    As a result of Bank's failure to deliver the releases of collateral and documents as aforementioned, Obligors 1, Obligors 2 and Affected Entities sustained damages and incurred

37

expenses including those in manners that future discovery, evidence, and testimony may or will establish.

211.   The Bank having full knowledge of the relationship between the Affected Entities and certain Obligors 1 and Obligors 2, and the operations of the Affected Entities, knew or should have known foreseen that Bank's failure would negatively impact the Affected Entities.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of greater than $50,000.00 together with applicable interest, costs of suit, and attorney's fees.

### COUNT IV

212.   The averments in paragraphs 1 through 211, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

213.   With regard to Loan 2, The Bank violated 15 U.S.C. § 1691 et seq, Equal Credit Opportunity Act of 1974 (herein "Regulation B")

214.   As a result of Bank's violation of Regulation B with regard to Loan 2, the Promissory Note for Loan 2 should be declared null and void as of the time of the violation.

215.   If the Promissory Note for Loan 2 is declared null and void, The Bank has been paid $318,122.77 from Obligors 1 and Obligors 2 that does not belong to the Bank.

216.   Regulation B provides an offending bank to pay actual attorney fees, actual damages, and punitive damages for violations thereunder.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of $318,122.77 with applicable interest, costs of suit, attorney's fees and punitive damages.

### COUNT V

217.    The averments in paragraphs 1 through 216, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

218.    With regard to Loan 1, The Bank violated 15 U.S.C. § 1691 et seq, Equal Credit Opportunity Act of 1974 (herein "Regulation B")

219.    As a result of Bank's violation of Regulation B with regard to Loan 1, the Promissory Note for Loan 2 should be declared null and void as of the time of the violation.

220.    If the Promissory Note for Loan 1 is declared null and void, The Bank has been paid $2,178,537.10 from Obligors 1 and Obligors 2 that does not belong to the Bank.

221.    Regulation B provides for an offending bank to pay actual attorney fees, actual damages, and punitive damages for violations thereunder.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of $2,178,537.10 with applicable interest, costs of suit, attorney's fees and punitive damages.


## COUNT VI

222.    The averments in paragraphs 1 through 221, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

223.    The Bank made fraudulent misrepresentations upon which Obligors 1 and Obligors 2 reasonably relied to their substantial detriment.

224.    Obligors 1 and Obligors 2 in reasonable reliance upon Bank's representations undertook various actions as detailed in the Complaint and as in manners that future discovery, evidence, and testimony may or will establish.

225.    The conduct of the Bank, as aforesaid, constitutes fraud and deceit.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of $1,500,000.00 for compensatory damages, plus an amount at least of $1,500,000.00 in punitive damages with applicable interest, costs of suit, attorney's fees, and such other relief as the Court deems just.

## COUNT VII

226.    The averments in paragraphs 1 through 225, inclusive, of this Complaint are incorporated herein by reference as if fully set forth herein and at length.

227.    The Bank undertook and then wrongfully breached fiduciary obligations to Obligors 1 and Obligors 2.

228.    The Bank possessed and exercised extraordinary control over Obligors 1 and Obligors 2 and the businesses which some of them or all of them owned, the Affected Entities.

229.    Any negative effects upon the Affected Entities would by definition trickle down to some or all of Obligors 1 and Obligors 2, and The Bank knew, or should have known same.

230.    A confidential relationship existed between the Bank and Obligors 1 and Obligors 2, thereby imposing fiduciary duties on the Bank including obligations of loyalty, fairness, good faith and disclosure.

231.    The Bank introduced the element of compulsion into the relationship between them and Obligors 1 and Obligors 2 in a variety of ways, and imposed fiduciary duties upon the Bank.

232.    The conduct of the Bank, as aforesaid, constitutes a breach of its fiduciary duties to Obligors 1 and Obligors 2 as well as the Affected Parties.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of

$1,500,000.00 for compensatory damages, plus an amount at least of $1,500,000.00 in punitive

damages, with applicable interest, costs of suit, attorney's fees, and such other relief as the Court

deems just.

## COUNT VIII

233.     The averments in paragraphs 1 through 232, inclusive, of this Complaint are

incorporated herein by reference as if fully set forth herein and at length.

234.     The Bank conspired with its Counsel to perpetuate, facilitate, and aid and abet the

frauds, breaches of fiduciary duty and other wrongs alleged herein.

235.     The Bank undertook substantial overt acts, as aforesaid, in furtherance of the

conspiracy alleged herein and are liable for the damage and harm to Obligors 1 and Obligors 2

and the Affected Entities.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of

$1,500,000.00 for compensatory damages, plus an amount at least of $1,500,000.00 in punitive

damages, with applicable interest, costs of suit, attorney's fees, and such other relief as the Court

deems just.

## COUNT IX

236.     The averments in paragraphs 1 through 235, inclusive, of this Complaint are

incorporated herein by reference as if fully set forth herein and at length.

237.     The conduct of the Bank constitutes breaches as alleged above, including breaches

of the obligations of good faith and fair dealing with respect thereto.

**WHEREFORE,** Plaintiffs demand judgement against Defendant in at least the amount of

$1,500,000.00 for compensatory damages, with applicable interest, costs of suit, attorney's fees,

and such other relief as the Court deems just.


Date: 11-9-17

David M. Twer, Esquire
Attorney for plaintiffs

## VERIFICATION

I, Mindy R. Twer, hereby state:

1.      I am a plaintiff in this action;

2.      I verify that the statements made in the foregoing Complaint are true and correct to the

best of my knowledge, information and belief; and

3.      I understand that the statements in said Complaint are made subject to the penalties of 18

Pa. C.S. §4904 relating to unsworn falsification to authorities.

Mindy R. Twer, Plaintiff

Dated:  11-9-17

## CERTIFICATE OF SERVICE

I do hereby certify that service of a true and correct copy of the within Complaint was made on the 13th day of November 2017 was served via First Class Mail upon all counsel or unrepresented parties whose names are set forth herein below:

KLEHR HARRISON, HARVEY BRANZBURG LLP
William R. Hinchman, Esquire
Kelsey Hughes-Blaum, Esquire
1835 Market Street, Suite 1400
Philadelphia, PA 19103

_____
David M. Twer, Esquire

44



**EXHIBIT A**



## MODIFICATION AGREEMENT, FORBEARANCE AGREEMENT AND DEED IN LIEU OF FORECLOSURE AGREEMENT

THIS MODIFICATION AGREEMENT, FORBEARANCE AGREEMENT AND DEED IN LIEU OF FORECLOSURE AGREEMENT (hereinafter referred to as the "**Agreement**") is made this _30th_ day of November, 2010 by and among **FOX CHASE BANK** (the "**Lender**"), **HENRY ABRAMS** ("**Loan 1 Borrower**"), **CITY ALUMINUM CORPORATION**, a Pennsylvania corporation ("**City**"), **HOWARD ABRAMS**, an individual ("**H.A.**"), **BETH ANNE ABRAMS**, an individual ("**B.A.**"), **DAVID TWER**, an individual ("**D.T.**") and **MINDY TWER**, an individual ("**M.T.**").

### BACKGROUND

A.    On or about May 30, 2007, Lender made a loan to Loan 1 Borrower in the principal amount of $2,250,000.00 ("**Loan 1**") which was evidenced by a Promissory Note executed and delivered by Loan 1 Borrower in favor of Lender in the principal sum of $2,250,000.00 (as the same may hereinafter be amended, modified, supplemented or restated from time to time, the "**Loan 1 Note**") and a Loan and Security Agreement (as the same may hereinafter be amended, modified, supplemented or restated from time to time, the "**Loan 1 Loan Agreement**").

B.    As security for Loan 1 Borrower's obligations under Loan 1, Loan 1 Borrower executed and delivered to Lender a Mortgage and Security Agreement dated May 30, 2007 and recorded on May 31, 2007 with the Philadelphia County Clerk's Office as Instrument No. 51703095 (as the same may be amended, modified, supplemented or restated from time to time, the "**1909 Mortgage**") for the land, building and other improvements located at 1909 E. Hagert Street, Philadelphia, Philadelphia County, Pennsylvania, as is more fully described in Exhibit "A" attached to the 1909 Mortgage (the "**1909 Mortgaged Property**").

C.    As further security for Loan 1 Borrower's obligations under Loan 1, Loan 1 Borrower executed and delivered to Lender an Assignment of Leases, Rents and Profits dated May 30, 2007 and recorded on May 31, 2007 with the Philadelphia County Clerk's Office as Instrument No. 51703096 for the 1909 Mortgaged Property (the "**1909 Assignment of Rents**").

D.    The obligations of the Loan 1 Borrower to Lender under Loan 1 were guaranteed by B.A. and D.T. in a sum limited to One Million Dollars (the last One Million Dollars due under Loan 1) and the obligations of the Loan 1 Borrower to Lender under Loan 1 were unconditionally and irrevocably guaranteed by City, H.A. and M.T. (together with B.A and D.T., "**Loan 1 Guarantors**" and each a "**Loan 1 Guarantor**") under that certain individual Guaranty and Surety Agreement executed by each respective Loan 1 Guarantor in favor of Lender (each a "**Loan 1 Guaranty Agreement**" and collectively, the "**Loan 1 Guaranty Agreements**") and dated May 30, 2007.  Loan 1 Borrower and Loan 1 Guarantors are also referred to individually herein as a "**Loan 1 Obligor**" and collectively as the "**Loan 1 Obligors**".

E.    On or about November 5, 2007, Lender made a loan to City (also referred to herein as "**Loan 2 Borrower**") in the principal amount of $250,000.00 ("**Loan 2**" and together with Loan 1, the "**Loans**") which was evidenced by a Promissory Note executed and delivered

by Loan 2 Borrower in favor of Lender in the original principal sum of $250,000.00 (as the same has been or may hereafter be amended, modified, supplemented or restated from time to time, the **"Loan 2 Note"**) and a Loan and Security Agreement (as the same has been or may hereinafter be amended, modified, supplemented or restated from time to time, the **"Loan 2 Loan Agreement"**).

      F.    The obligations of Loan 2 Borrower to Lender under Loan 2  were unconditionally and irrevocably guaranteed by H.A. and M.T., under those certain individual Guaranty and Surety Agreements executed by H.A. and M.T., respectively, in favor of Lender (each a **"Loan 2 Guaranty Agreement"** and collectively, the **"Loan 2 Guaranty Agreements"**) each dated November 5, 2007. H.A. and M.T. (collectively, the **"Loan 2 Guarantors"** and each a **"Loan 2 Guarantor"**) together with Loan 2 Borrower are also referred to herein collectively as the **"Loan 2 Obligors"** and individually as a **"Loan 2 Obligor "**.

      G.    The Loan 1 Note, the Loan 1 Loan Agreement, the Loan 1 Guaranty Agreements, the 1909 Mortgage, the 1909 Assignment of Rents and all other documents executed in connection with Loan 1 are collectively referred to herein as the **"Loan 1 Documents"**. The Loan 2 Note, Loan 2 Loan Agreement, Loan 2  Guaranty Agreements and all other documents executed in connection with Loan 2 are collectively referred to herein as the **"Loan 2 Documents"**. The Loan 1 Documents and the Loan 2 Documents are referred to herein collectively as the "Loan Documents".

      H.    Loan 1 Obligors are in default under Loan 1 and Loan 2 Obligors are in default under Loan 2 due, *inter alia*, to the occurrence of the acts or omissions listed on **Schedule 1** of this Agreement (collectively, the **"Existing Defaults"**).

      I.    On September 23, 2010 Lender sent Notices of Default and Acceleration and Notices of Second Default to Loan 1 Obligors wherein Lender advised Loan 1 Obligors that Loan 1 Borrower was in default under Loan 1 and that the unpaid balance of Loan 1 was immediately due and payable.

      J.    On September 23, 2010 Lender sent Notices of Default and Acceleration, Notices of Demand for Payment of a Matured Obligation Regarding Promissory Note and Notices of Second Default to Loan 2 Obligors wherein Lender advised Loan 2 Obligors that Loan 2 Borrower was in default under Loan 2  for failure to pay Loan 2  in full on or before June 30, 2010.

      K.    On October 12, 2010, Lender filed Complaints in Confession of Judgment with respect to Loan 1 against Loan 1 Borrower and City in the Court of Common Pleas of Philadelphia County, Pennsylvania and on October 13, 2010, Lender filed Complaints in Confession of Judgment with respect to Loan 1 against H.A., B.A., D.T. and M.T. in the Court of Common Pleas of Bucks County, Pennsylvania. Judgments were entered against each of Loan 1 Borrower, City, H.A., B.A., D.T. and M.T. in the amount of $2,331,408.43 and the judgments entered against B.A. and D.T. were subsequently each amended by a Praecipe to Reassess Damages to Limit the Amount of the Judgment to $1,000,000.00 (collectively, the **"Loan 1 Judgments"**).

L.     Loan 1 Obligors and Loan 2 Obligors, as applicable, acknowledge they are in default under the Loan Documents.

M.     Interest on Loan 1 has been accruing at the default rate of interest (the **"Loan 1 Default Rate"**), which rate is two percent (2%) in excess of the contractual rate of interest since September 24, 2010 and interest on Loan 2 has been accruing at the default rate of interest (the **"Loan 2 Default Rate"**), which rate is two percent (2%) in excess of the contractual rate of interest since September 24, 2010.

N.     Loan 1 Obligors and Loan 2 Obligors desire to resolve all the disputes between them and Lender and have agreed to modify the Loan 1 Documents and the Loan 2 Loan Documents in accordance with the terms set forth in this Agreement.

O.     Capitalized terms not otherwise defined herein shall have the meanings given such terms in the Loan Documents.

**NOW, THEREFORE**, in consideration of the mutual promises herein contained and for other good and valuable consideration, receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, agree as follows:

1.     **Incorporation of Recitals**.  Loan 1 Obligors and Loan 2 Obligors do hereby, jointly and severally, ratify, confirm and acknowledge that the statements contained in the foregoing Background are true and complete in all respects and that the Loan Documents, including without limitation the Loan 1 Guaranty Agreements, the Loan 2 Guaranty Agreements and the 1909 Mortgage, are valid, binding and in full force and effect, without setoff, defense or counterclaim, as of the date hereof, and fully enforceable against Loan 1 Obligors and Loan 2 Obligors, as applicable, and their respective assets in accordance with the terms thereof. Lender hereby ratifies, confirms and acknowledges that Paragraphs A, B, C, D, E, F, G, I, J, M and O contained in the foregoing Background are true and complete in all respects.

2.     **Confirmation of Existing Indebtedness**.  Loan 1 Obligors and Lender hereby confirm and acknowledge that as of November __, 2010, the principal balance outstanding under Loan 1 is $2,178,537.10.  The foregoing sums, together with all accrued and unpaid interest thereon, attorney's fees and expenses and all other costs and expenses due or to become due under this Agreement shall be collectively referred to herein as the **"Loan 1 Indebtedness"**. Loan 2 Obligors and Lender hereby confirm and acknowledge that as of November __, 2010 the principal balance outstanding under Loan 2 is $318,122.77.  The foregoing sums, together with all accrued and unpaid interest thereon, reasonable attorney's fees and expenses and all other costs and expenses due or to become due under this Agreement shall be collectively referred to herein as the **"Loan 2 Indebtedness"**.

3.     **Interest on the Loans**.   The principal balance of the Loan 1 Note will continue to accrue interest at the Loan 1 Default Rate.  The principal balance of the Loan 2 Note will accrue interest at the Loan 2 Default Rate.  Notwithstanding anything to the contrary contained herein, provided that no Event of Default occurs under Loan 1, Loan 2 or this Agreement, Loan 1 Borrower and Loan 2 Borrower will not be required to make monthly payments of accrued interest on Loan 1 and Loan 2 during the Forbearance Period.  Upon the expiration of the Forbearance Period, all interest accruing at the Loan 1 Default Rate and the Loan 2 Default Rate

3

shall become immediately due and payable, provided however if no Event of Default under Loan 1, Loan 2 or this Agreement shall occur, interest at the contractual rate (and not the Loan 1 Default Rate and Loan 2 Default Rate) shall be immediately due and payable.

4.   **Payments on the Loans; Maturity Date**.

A.     Commencing on January 1, 2011 and on the first day of each calendar month thereafter, Loan 1 Obligors shall make a monthly payment of Three Thousand Dollars ($3,000.00) to be applied to the principal balance of Loan 1 (each a "**Monthly Payment**" and collectively, the "**Monthly Payments**"). Notwithstanding the foregoing, Loan 1 Obligors shall be released from the obligation to make the Monthly Payments if no Event of Default under Loan 1, Loan 2 or this Agreement has occurred and all of the Additional Hagert Properties (as hereinafter defined) have been sold in accordance with the terms of **Section 6(a)** below and the proceeds of such sale(s) have been applied to the remaining principal due with respect to Loan 1. Provided no Event of Default under Loan 1, Loan 2 or this Agreement shall occur, Loan 2 Obligors shall have no requirement to make monthly payments of principal and/or interest for Loan 2 during the Forbearance Period.

B.     Loan 1 Obligors shall not be required to make a Monthly Payment if during the immediately preceding calendar month Lender has received insurance proceeds equal to or greater than the total amount of the monthly principal and interest at the contractual rate for Loan 1 and the monthly payment of interest at the contractual rate for Loan 2. Except as expressly stated in the preceding sentence, Loan 1 Obligors and Loan 2 Obligors shall not have the right to apply insurance proceeds received in a particular calendar month to reduce or eliminate the requirement for Monthly Payments in the following calendar months.

C.     If Loan 1 Obligors and Loan 2 Obligors pay all principal due under both Loan 1 and Loan 2 and all of Lender's reasonable legal fees, plus the costs of any appraisals, title commitments, title policies and other materials reasonably required by Lender on or before December 31, 2010, Lender shall forgive all contractual interest and default interest due under Loan 1 and Loan 2. All interest collected by the Lender shall be re-applied to the reduction of principal and shall be forgiven upon the payment of all principal due under Loan 1 and Loan 2 and all of Lender's attorneys fees and costs as referenced above. At such time, Lender shall execute any documentation necessary to release all collateral owned by Loan 1 Obligors and Loan 2 Obligors and return all applicable documentation regarding such collateral, including all documents held in escrow, to Loan 1 Obligors and Loan 2 Obligors, as applicable.

D.     Notwithstanding anything to the contrary in the Loan 1 Documents, the Maturity Date for Loan 1 shall be November 30, 2011. Notwithstanding anything to the contrary in the Loan 2 Documents, the Maturity Date for Loan 2 shall be November 30, 2011.

E.     Voluntary payments by Loan 1 Obligors and Loan 2 Obligors which are not covered by Section 4A or by Sections 7(b), 7(c) or 7(d) shall be applied, at Lender's sole discretion, to Loan 1 or Loan 2. Payments shall first be applied to outstanding attorney's fees and costs, second to accrued and unpaid interest and last to outstanding principal.

5.   **Mortgages on 1909 Mortgaged Property and Additional Properties**.

A.      As additional security for Loan 2, Loan 1 Borrower shall simultaneously with the execution of this Agreement grant to Lender a second priority mortgage lien and execute an Assignment of Rents and Leases with respect to the 1909 Mortgaged Property (the "**1909 Second Mortgage**").

B.      As additional security for Loan 1 and Loan 2, (1) Loan 1 Borrower shall simultaneously with the execution of this Agreement grant to Lender a first priority mortgage lien and execute an Assignment of Rents and Leases with respect to the real property located at 1910 Hagert Street, Philadelphia, Pennsylvania ("**1910 Hagert**"); and (2) H.A. and M.T. shall simultaneously with the execution of this Agreement grant to Lender a first priority mortgage lien and execute an Assignment of Rents and Leases with respect to the real properties located at 1912, 1914 and 1916 Hagert Street, Philadelphia, Pennsylvania. 1910 Hagert and 1912, 1914 and 1916 Hagert Street are each referred to herein as an "**Additional Hagert Property**" and collectively referred to herein as the "**Additional Hagert Properties**".

The 1909 Mortgaged Property and the Additional Hagert Properties are collectively referred to in this Agreement as the "**Mortgaged Properties**".

C.      Lender shall not require Loan 1 Obligors and Loan 2 Obligors to pay for Lender's Title Insurance Policies for the Additional Hagert Properties, provided that: (a) all taxes, including real estate taxes owed for 2010, have been paid on all of the Additional Hagert Properties; and (2) upon the expiration of ninety (90) days from the Effective Date, Lender or its counsel shall obtain new bringdown searches (paid for by Loan 1 Obligors and Loan 2 Obligors) demonstrating that there have been no intervening liens or transfer of the ownership of any of the Additional Hagert Properties. The existence of any such intervening lien or transfer has taken place, such event shall constitute an Event of Default under this Agreement.

6.    **Sale of Additional Hagert Properties.**

A.      Lender acknowledges and agrees that Loan 1 Borrower, H.A. and M.T. may desire to sell one or more of the Additional Hagert Properties. Lender agrees to release its lien on each Additional Hagert Property, subject to the following terms and conditions: (i) Loan 1 Borrower, H.A. and/or M.T., as applicable, delivers to Lender a fully executed agreement of sale for such Additional Hagert Property in form and content reasonably satisfactory to Lender; (ii) Lender in its sole discretion shall have the right to approve the sale price for each Additional Hagert Property; and (iii) Lender receives as a release price an amount equal to the Net Proceeds (as hereinafter defined) from the sale. Any release price paid to Lender pursuant to this **Section 6** shall be applied to the principal balance of either Loan 1 or Loan 2 at Lender's sole discretion. As used herein, the "Net Proceeds" shall be the proceeds with respect to each Additional Hagert Property after payment of transfer taxes, broker fees, other standard closing costs paid for by sellers and an allowance of twenty-five percent (25%) to offset the capital gains tax incurred by the sale of the Additional Hagert Properties. In consideration for such release price, Lender shall deliver the necessary documentation to the designated title company (if there is no designated title company, the documentation shall be released to the applicable seller or prospective purchaser) evidencing that such Additional Hagert Property is released from the Lender's mortgage. Upon the sale of all of the Additional Hagert Properties, Loan 1 Obligors shall be released from the obligation to make the Monthly Payments.

913808-10

5

B.     Loan 1 Borrower, H.A. and M.T. shall have the right to pay the sum of Eighty Thousand Dollars ($80,000.00) (the "**Additional Hagert Properties Release Price**") and obtain a release from Lender of the Additional Hagert Properties. In consideration of its receipt of the Additional Hagert Properties Release Price, Lender shall execute the necessary documentation to release the Additional Hagert Properties from the Lender's mortgage. Notwithstanding the provisions of Section 6 A, the payment by Loan 1 Borrower, H.A. and M.T. of the Additional Hagert Properties Release Price shall not release Loan 1 Obligors from the obligation to make the Monthly Payments.

7.     **Sale of 1909 Mortgaged Property; Assignment of Rights as Additional Insured Parties**.

(a)     Provided however, Lender acknowledges that Loan 1 Obligors have made insurance claims due to a fire that occurred at the 1909 Mortgaged Property on October 25, 2010. Loan 1 Obligors agree that they shall diligently pursue a resolution and/or settlement of all insurance claims and shall use best efforts to reach a final resolution and/or settlement with the insurance company. Loan 1 Obligors further agree that they shall use best efforts to sell the Mortgaged Property when such sale is commercially feasible.

(b)     Loan 1 Borrower, City, H.A., B.A., D.T. and M.T. hereby assign to Lender all of their right, title and interest to all proceeds paid to the Insured parties and the Additional Insured parties with respect to the property insurance policy for the 1909 Mortgaged Property. Loan 1 Obligors and Loan 2 Obligors hereby agree to execute any documentation reasonably necessary to ensure that any insurance proceeds with respect to the 1909 Mortgaged Property are paid directly to Lender and to notify the insurance company that any insurance proceeds with respect to the 1909 Mortgaged Property are to be paid directly to Lender. Any insurance proceeds received by Loan 1 Obligors or Loan 2 Obligors shall be immediately paid to Lender. Whenever feasible, Lender shall in its sole discretion use the description of collateral identified in each disbursement of insurance proceeds to determine whether such proceeds should be applied to the Loan 1 Indebtedness or the Loan 2 Indebtedness. In the event that either the Loan 1 Indebtedness or the Loan 2 Indebtedness is paid in full, any additional insurance proceeds shall be applied against the remaining indebtedness due under the other Loan. Loan 1 Obligors and Loan 2 Obligors shall have no right to receive or retain any insurance proceeds with respect to the 1909 Mortgaged Property until the Loan 1 Indebtedness and the Loan 2 Indebtedness have been paid in full.

(c)     With the exception of insurance proceeds specifically designated for the payment of current taxes and insurance obligations as set forth below, lost wages (as set forth in subsection 7(d) below) and proceeds expressly designated for demolition, security, electricity or an other purpose directly relating to protecting the condition of the 1909 Mortgaged Property, any proceeds paid by the insurance company with respect to business income insurance shall be paid to the Lender and applied first to attorneys fees and costs, then to accrued and unpaid interest for Loan 1 or Loan 2, and last, to the principal balance of Loan 1 or Loan 2. Whenever feasible, Lender shall in its sole discretion use the description of collateral identified in each disbursement of insurance proceeds to determine whether such proceeds should be applied to the Loan 1 Indebtedness or the Loan 2 Indebtedness. In the event that either the Loan 1 Indebtedness or the Loan 2 Indebtedness is paid in full, any additional insurance proceeds shall be applied against the remaining indebtedness due under the other Loan. Furthermore, Loan 1 Obligors shall be entitled to reimbursement of payments of taxes and insurance made for the period from and after October 25, 2010 so long as the insurance company designates specific

insurance proceeds to be used for such purpose and for such timer period and evidence of the insurance company's payments for reimbursement is provided to Lender.

(d)     Loan 1 Obligors shall be entitled to retain insurance proceeds arising from the lost wages of any Loan 1 Obligors and/or the preparation of inventory schedules, provided that insurance proceeds are disbursed by the insurance company pursuant to the terms of the existing policy of insurance expressly for the purpose of covering lost wages of any Loan 1 Obligors and/or the preparation of inventory schedules and such disbursement does not exceed a maximum of Ten Thousand Dollars ($10,000.00).  To the extent there are any excess insurance proceeds paid by the insurance company as a result of lost wages, such sums shall be applied to the principal balance of Loan 1 or Loan 2 in Lender's sole discretion.

8.     **Conveyance to Lender or its Nominee.**  In consideration of Lender entering into this Agreement, on the Effective Date, the applicable Loan 1 Obligors and Loan 2 Obligors shall cause the owner of each of the Mortgaged Properties and each of the Bucks County Properties to deliver to Lender or Lender's nominee or assignee, original executed deeds, bills of sale and other customary real estate conveyances (collectively, the **"Conveyance Documents"**) with respect to each of the Mortgaged Properties and each of the Bucks County Properties (as hereinafter defined).  The Lender shall hold the Conveyance Documents in escrow until such time as an Event of Default occurs hereunder.  Upon the occurrence of an Event of Default, the Conveyance Documents shall be deemed released by the applicable Loan 1 Obligors and Loan 2 Obligors and Lender shall have the right to record the Conveyance Documents with the Bucks County Recorder of Deeds or the Philadelphia County Recorder of Deeds, as applicable.  In the event that prior to the occurrence of an Event of Default the Loan 1 Indebtedness and Loan 2 Indebtedness is paid in full, Lender shall return the Conveyance Documents to the applicable Loan 1 Obligors and Loan 2 Obligors and the conveyance of the Mortgaged Properties and the Bucks County Properties contemplated hereby shall be deemed null and void and the Conveyance Documents shall be of no further force and effect.  The Conveyance Documents shall grant to Lender or Lender's nominee or assignee:

(a)     title in and to the Mortgaged Properties and the Bucks County Properties by Deeds in Lieu of Foreclosure (each a **"Deed in Lieu of Foreclosure"** and, collectively, the **"Deeds in Lieu of Foreclosure"**) for the Mortgaged Properties and the Bucks County Properties in the form of **Exhibit "A"** attached hereto and title to all buildings, improvements and appurtenances on the Mortgaged Properties and the Bucks County Properties and any interest of any Obligor in all streets, alleys and public ways adjacent thereto, whether before or after vacation thereof, and all real estate agreements and any other agreements, if any, in effect with respect to the Mortgaged Properties or the Bucks County Properties;

(b)     title in and to all personal property, inventory, chattel paper, accounts, contract rights, equipment, fixtures and appliances, whether owned now or acquired later, all accessions, additions, replacements and substitutions and all proceeds thereof, used or usable in connection with the operation of the Mortgaged Properties and the Bucks County Properties to which any Obligor or Alum II (as hereinafter defined) shall have title, and all personal property acquired for installation or use in connection with the Mortgaged Properties and the Bucks County Properties, wherever located (collectively the **"Personal Property"**); and

(c)    title in and to all intangible property, whether owned now or acquired later, and all accessions, additions, replacements and substitutions used in connection with the Mortgaged Properties and the Bucks County Properties and the Personal Property, and contract rights, general intangibles, agreements, commitments and insurance policies, choices in action and all assignable licenses, permits and permissions relating to the Mortgaged Properties and the Bucks County Properties or the Personal Property which any Obligor shall have title or license to use (collectively the **"Intangible Property"**).    The Personal Property and the Intangible Property shall be conveyed to Lender by a Bill of Sale in the form of **Exhibits "B"** attached hereto.

The remedies described in this **Section 8** are intended to expedite and facilitate the Lender's ability to acquire the Mortgaged Properties and the Bucks County Properties and related assets upon the occurrence of an Event of Default.

As used in this Agreement, (1) the real property located at 44 Albert Street, Feasterville-Trevose, Bucks County, Pennsylvania ("**Albert St. Property**"), (2) the real property located at 1333 Buck Road, Feasterville-Trevose, Bucks County, Pennsylvania ("**Buck Road Property**"), (3) the real property located at 1300 Bridgetown Pike, Feasterville, Bucks County, Pennsylvania ("**1300 Bridgetown Property**") and (4) the real property located at 1334 Bridgetown Pike, Feasterville, Bucks County, Pennsylvania ("**1334 Bridgetown Property**") are each referred to herein as a "**Bucks County Property**" and collectively as the "**Bucks County Properties**".

9.    **Mortgages and Releases with Respect to the Bucks County Properties**.

A.    As additional security for Loan 1 and Loan 2, H.A, B.A., D.T and M.T. shall simultaneously with the execution of this Agreement cause Alum II to grant to Lender (1) a second priority mortgage lien against the Albert St. Property; (2) a fourth priority mortgage lien against the Buck Road Property; (3) a second priority mortgage lien against the 1300 Bridgetown Property; and (4) a third priority mortgage lien against the 1334 Bridgetown Property (collectively, the "**Bucks County Mortgages**"). Alum II shall also execute an Assignment of Rents and Leases in favor of Lender with respect to each of the Bucks County Properties (collectively, the "**Bucks County ALRs**"). The Lender shall hold the Bucks County Mortgages and Bucks County ALRs in escrow until such time as an Event of Default occurs hereunder. Upon the occurrence of an Event of Default, the Bucks County Mortgages and Bucks County ALRs shall be deemed released and Lender shall have the right to record the Bucks County Mortgages and Bucks County ALRs with the Bucks County Recorder of Deeds. In the event that prior to the occurrence of an Event of Default the Loan 1 Indebtedness and Loan 2 Indebtedness is paid in full, Lender shall return the Bucks County Mortgages and Bucks County ALRs to H.A., B.A., D.T. and M.T and encumbrance of the Bucks County Properties contemplated hereby shall be deemed null and void and the Bucks County Mortgages and Bucks County ALRs shall be of no further force and effect.

B.    H.A., B.A., D.T. and M.T. shall cause Alum II to obtain Lender's prior written consent before permitting additional liens to encumber any of the Bucks County Properties, provided that Lender's consent shall not be unreasonably withheld or delayed.

C.     H.A, B.A., D.T. and M.T. shall have the right to cause Alum II to sell one or more of the Bucks County Properties for an amount equal to or greater than the release price set forth on the attached **Schedule 9**, provided that Lender is given at least fifteen (15) days prior written notice of such sale and that Lender receives as a release price an amount equal to the net proceeds of such sale after the payment of transfer taxes, brokers' fees, prior mortgage liens and other customary closing costs paid for by sellers. The attached **Schedule 9** sets forth the value of each Bucks County Property that has been agreed upon by Lender and H.A, B.A., D.T. and M.T.

10.   **Vacating of Judgments and Execution of Consent Judgment.** On or about the Effective Date, Lender shall file a Complaint in Mortgage Foreclosure against Loan 1 Borrower with respect to the 1909 Mortgaged Property (the "**Foreclosure Action**"). Within five (5) days thereafter, Lender shall file a Praecipe to Vacate the Loan 1 Judgments (except for any Loan 1 Judgments entered against City that shall be removed upon the written request of Loan 1 Obligors), in the form of **Exhibit "C"** attached hereto. Simultaneously with its execution of this Agreement, Loan 1 Borrower shall execute and deliver to Lender a Stipulation as to Liability in the Foreclosure Action in the form attached hereto as **Exhibit "D"** ("**Stipulation**"), confirming that Loan 1 Borrower does not have any defense to the action in mortgage foreclosure and agrees that, upon the filing of the Stipulation with the Court of Common Pleas of Philadelphia County that a judgment as to liability will be entered against Loan 1 Borrower. Lender or Lender's representative shall also execute the Stipulation. Lender agrees that it shall not attempt to obtain a final judgment in mortgage foreclosure with respect to the Foreclosure Action unless or until an Event of Default has occurred or the Forbearance Period has expired. The parties further agree that a final judgment in mortgage foreclosure with respect to the Foreclosure Action shall be entered against Borrower as determined by the Court of Common Pleas of Philadelphia County at a later date pursuant to a further Stipulation as to the amount of the judgment in mortgage foreclosure or pursuant to further order of the Court upon the request of either Lender or Borrower for a hearing to determine the amount of the judgment in mortgage foreclosure. Lender's counsel shall hold the Stipulation in escrow until such time as an Event of Default occurs hereunder. Upon the occurrence of an Event of Default, the Stipulation shall be deemed released by Borrower and Lender shall have the right to record the Stipulation in the Prothonotary's Office of Philadelphia County. In the event that the Loan 1 Indebtedness and Loan 2 Indebtedness is paid in full and no Event of Default shall have occurred, Lender shall Lender shall settle, discontinue and end the Foreclosure Action and return the Stipulation to Borrower and the Stipulation shall be of no further force and effect.

11.   **Pledge of Stock and Entity Interests; Release of Pledged Interests.**

(a)     D. T. shall enter into an Ownership Interest Pledge Agreement ("**D.T. Pledge**") granting Lender a collateral assignment of his ownership interests in the following entities:   1421 Spruce Street Limited Partners, a Pennsylvania limited partnership ("**1421 Spruce**"), Venus LP, a Pennsylvania limited partnership ("**Venus**"), and Mighty Max Development Corp., a Pennsylvania corporation ("**Mighty Max**"). H.A., B.A., D.T. and M.T. shall enter into an Ownership Interest Pledge Agreement ("**City Alum Pledge**" and together with the D.T. Pledge collectively the "**Pledge Agreements**") granting Lender a collateral assignment of their respective partnership interests in City Alum LP II, a Pennsylvania limited partnership ("**Alum II**"). The ownership interests in 1421 Spruce, Venus, Mighty Max and Alum II are collectively referred to herein as the "**Pledged Ownership Interests**". Lender shall not enforce

its rights with respect to the Pledged Ownership Interests or the assignments related thereto until an Event of Default occurs hereunder. Upon the occurrence of an Event of Default, Lender shall have the right to enforce its rights pursuant to the terms of such Pledge Agreements.

(b)     On the Effective Date, D.T. shall (1) deliver to Lender a $100,000 Confession of Judgment Note (the "**D.T. Note**") and (2) withdraw ten thousand shares of stock in First Priority Bank (that was formerly stock of Prestige Bank) having a value of a minimum of One Hundred Thousand Dollars ($100,000.00) at original cost ("**First Priority Stock**") from JAMD Partners and place the First Priority Stock in his name. D.T. shall thereafter pledge all of its interest in the First Priority Stock to the Lender in accordance with an Ownership Interest Pledge Agreement to be delivered by D.T., which shall be substantially in the form of **Exhibit F** attached hereto. Upon Lender's receipt and approval of the original certificates evidencing the First Priority Stock, the D.T. Note shall be returned to D.T. and marked "CANCELLED". As set forth in Section 15 (c), the failure of D.T. to deliver the original certificates evidencing the First Priority Stock within sixty (60) days of the Effective Date or pay Lender the amount due under the D.T. Note shall constitute an Event of Default under this Agreement. In the event that the Loan 1 Indebtedness and Loan 2 Indebtedness is paid in full and no Event of Default shall have occurred, Lender shall return the First Priority Stock to D.T. and the pledge agreement with respect to such First Priority Stock shall be of no further force and effect.

(c)     For every payment (1) made by D.T. equal to or greater than $200,000.00, or (2) made by any source other than D.T. to reduce D.T.'s guaranteed obligation of the last One Million Dollars ($1,000,000.00) under Loan 1 to Eight Hundred Thousand Dollars ($800,000) or less, in either event the Bank shall release collateral of equal value. The attached **Schedule 11** sets forth the value of the Pledged Ownership Interests and the First Priority Stock that have been agreed upon by Lender and the Loan 1 Obligors and Loan 2 Obligors. Lender, in its sole discretion, shall have the right to designate the order in which the Pledged Ownership Interests and the First Priority Stock shall be released.

12.     **Additional Obligations of Loan 1 Obligors and Loan 2 Obligors**. In addition to the provisions set forth herein, Loan 1 Obligors and Loan 2 Obligors agree to use its good faith efforts to cooperate with the Lender, its representatives and consultants. In addition, the obligations of Loan 1 Obligors and Loan 2 Obligors include, but are not limited to, providing to Lender or its representatives (including consultants) on the Effective Date (unless otherwise stated below) the following if and to the extent applicable:

(a)     All service and product warranties, equipment instructions (heaters, elevators, trash compactors, generators, sprinkler system, fire alarm, security system, electronic entry system, and all other mechanical systems not specifically mentioned or itemized);

(b)     Access to all accounting records, including accounts payable records, invoices, claims for payment, outstanding charges (whether disputed or not), change orders, or receipts which in any way relate to the management of the Mortgaged Properties;

(c)     Copies of all architect, designer and engineering plans, specs, licenses and permits, submissions to municipal and state authorities, including those placed on computer discs or retained on a computer hard drive;

     (d)   Copies of any lawsuit, cause in action or insurance claim asserted by Borrower or any related entity pertaining to the Mortgaged Properties;

     (e)   Copies of any and all agreements with neighbors, easements, repairs promised etc.; and

     (f)   Copies of all certificates of occupancy for the Mortgaged Properties and any other certificates that may become available.

13.   **Conditions Precedent**.  The provisions of this Agreement shall not be deemed effective unless and until Lender shall have received each of the following, which shall be in form and content satisfactory to Lender:

(a) A fully executed mortgage executed by the applicable mortgagor with respect to each of the Additional Hagert Properties and each of the Bucks County Properties in the form attached hereto as **Exhibit "E"** hereto;

(b) Fully executed 1909 Second Mortgage;

(c) Fully executed Conveyance Documents;

(d) Fully executed Stipulation;

(e) Fully executed Pledge Agreements in the form of **Exhibit "F"** attached hereto;

(f) Delivery to Lender of the original Stock Certificate No. 1 evidencing 100 shares of stock in Mighty Max, duly endorsed in blank or accompanied by appropriate instruments of transfer satisfactory to Lender;

(g) Execution of any documentation required to comply with **Section 7(b)**;

(h) Copies of the most recent appraisals for each Bucks County Property, provided that Loan 1 Obligors, Loan 2 Obligors and Lender acknowledge that no appraisal exists for the Albert St. Property and notwithstanding the provisions of Section 9 of this Agreement, Lender shall have the right to withhold its consent to a release of the Albert St. Property in its sole and absolute discretion;

(i) Copies of the most recent loan statements for any mortgage securing a Bucks County Property, except that Lender waives the requirement for a loan statement concerning the second priority mortgage encumbering the 1334 Bridgetown Property.

14.   **Forbearance by Lender**.  Lender agrees, subject to the terms of this Agreement, from the date that this Agreement is executed by Lender (the **"Effective Date"**) until the earlier of (A) November 30, 2011 or (B) such date as an Event of Default occurs under this Agreement (the **"Forbearance Period"**), to forbear from further exercising its rights and remedies against any of the Loan 1 Obligors and Loan 2 Obligors pursuant to the Loan Documents and/or the Judgments.

This Agreement shall not be construed to require Lender to forbear from exercising any of its rights and remedies under the Loan Documents or this Agreement upon the occurrence of an Event of Default pursuant to **Section 15** below (other than the Existing Defaults).   This Agreement shall not be construed to require Lender to forbear from exercising any of its rights or remedies under the terms of the Loan Documents or this Agreement after the expiration of the Forbearance Period.

15.   **Events of Default**.  Each of the following shall constitute an **"Event of Default"** under this Agreement:

(a)   Any failure by Loan 1 Obligors or Loan 2 Obligors to make payment within five (5) days of the date such payment is due under this Agreement or any of the Loan Documents;

(b)   Any failure by Loan 1 Obligors or Loan 2 Obligors to perform or observe any term, condition, warranty, requirement or provision of this Agreement; provided that Lender shall have given Loan 1 Obligors and Loan 2 Obligors written notice of such failure and a period of at least fifteen (15) days after such notice shall have expired without the Loan 1 Obligors or Loan 2 Obligors commencing to cure such failure and continuing thereafter for not more than an additional fifteen (15) days in the event that such failure cannot be cured within the original fifteen (15) days, except that Loan 1 Obligors or Loan 2 Obligors, as applicable, shall only have three (3) business days to cure such failure if a specific time period for performance is set forth in the applicable section of this Agreement;

(c)   Failure to deliver the stock certificates required by **Section 11(b)** hereof on or prior to the date that is sixty (60) days after the Effective Date or pay in full the sum due under the D.T. Note as provided for in Section 11(b) of this Agreement;

(d)   The execution of (1) any amendment to the partnership agreements of Alum II, 1421 Spruce or Venus without the prior written consent of Lender, provided that such consent shall not be unreasonably withheld or delayed; or (2) any amendment to the Bylaws or other organizational documents of Mighty Max and Yenom Management Corporation, a Pennsylvania corporation without the prior written consent of Lender, provided that such consent shall not be unreasonably withheld or delayed;

(e)   The entry of any judgment against any Loan 1 Obligor or Loan 2 Obligor by any third party not cured within thirty (30) days after notice; and

(f)   The occurrence of any default or Event of Default (not including the Existing Defaults set forth in **Schedule 1** of this Agreement) under any of the Loan Documents and the failure by Loan 1 Obligors and Loan 2 Obligors to cure same during the cure period, if any, set forth in such documents.

16.   **Notice of a Default**.  Lender shall provide notice to Loan 1 Obligor and Loan 2 Obligor of an Event of Default pursuant to the terms of this Agreement, via certified mail, return receipt requested, or nationally recognized courier service and via telecopy when possible, addressed as follows:

Lender:

Fox Chase Bank
4390 Davisville Road
Hatboro, PA 19040-2544
Attention:  Jerry Holbrook

with a copy to:

Spector Gadon & Rosen, P.C.
1635 Market Street, 7th Floor
Philadelphia, PA 19103
Attn: David M. Giles, Esquire

To Loan 1 Obligors and Loan 2 Obligors, as applicable:

Henry Abrams
c/o David M. Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA 19053

Howard Abrams
64 Timothy Drive
Ivyland, PA  18974

Beth Anne Abrams
64 Timothy Drive
Ivyland, PA  18974

Mindy Twer
17 Mayflower Circle
Holland, PA  18966

David Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA 19053

City Aluminum Company, Inc.
c/o David M. Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA 19053

with a copy to:

David M. Twer, Esquire
1234 Bridgetown Pike, Suite 200
Feasterville, PA 19053

13

913808-10

Upon the occurrence of an Event of Default, Lender may immediately exercise any and all of its rights and remedies against any Loan 1 Obligor or Loan 2 Obligor under this Agreement and the Loan Documents, as well as any and all of its rights and remedies at law or in equity without further notice.

17. **Cross-Collateralization: Confirmation of Collateral**. Loan 1 Obligors and Loan 2 Obligors hereby confirm, acknowledge and agree that all Loan 1 Indebtedness and Loan 2 Indebtedness is and shall be cross-collateralized and, without limited the foregoing, Loan 1, Loan 2 and all other Loan 1 Indebtedness and Loan 2 Indebtedness are and shall continue to be secured by all liens, security interests, assignments, suretyship obligations, rights and remedies granted to Lender in the Loan Documents, which liens, mortgages, security interests, rights and remedies are hereby reaffirmed and continued as security for the foregoing; and all of the Loan Documents are hereby amended to reflect the same. None of the collateral granted to Lender shall be impaired by anything contained herein and all such collateral shall continue to secure all present and future Loan 1 Indebtedness and Loan 2 Indebtedness.

18. **Release and Waiver of Claims**. With the sole exception of Lender's obligations under this Agreement, Loan 1 Obligors and Loan 2 Obligors and their heirs, executors, administrators, personal representatives, successors and assigns (collectively, the **"Releasors"**) remise, release, quitclaim and forever discharge Lender and any other corporation, partnership, trust or other entity controlled by, controlling or under common control with Lender, and their respective employees, officers, directors, contractors, shareholders, partners, agents, attorneys (including without limitation Spector Gadon & Rosen, P.C., and each of its shareholders and employees), accountants, heirs, executors, administrators, and personal representatives (collectively, the **"Releasees"**), of and from any and all damages, losses, expenses, claims, demands, actions, causes of action, suits, judgments, orders, decrees, and any execution thereon, whether at law, in equity or otherwise, which Releasors had, have, or may in the future have, of any kind of nature whatsoever, past, present or future, known or unknown, and whether the same were or could have been discovered, against any other party, fixed or contingent, from the beginning of time through the date of the execution of this Agreement (but not after the date of the execution of this Agreement), under the laws of any state or the United States of America, or any other nation, which Releasors may have or claim to have against Releasees as a result of any transaction, agreement or litigation between Releasors and Releasees, including but not limited to the Loan Documents.

19. **Additional Documents and Future Actions**. Loan 1 Obligors and Loan 2 Obligors will, at their sole cost, take such actions and provide Lender from time to time with such agreements, and additional instruments, documents or information as Lender may in its discretion deem necessary or advisable to perfect, protect, maintain or enforce the security interests. Loan 1 Borrower and Loan 2 Borrower hereby authorize and appoint Lender as their attorney-in-fact, with full power of substitution, to take such actions as Lender may deem advisable to protect its collateral and its interests thereon and its rights hereunder, to execute on Loan 1 Borrower and Loan 2 Borrower's behalf and file financing statements and amendments thereto, in those public offices deemed necessary or appropriate by Lender to establish, maintain and protect a continuously perfected security interest in the collateral and to execute on Loan 1 Borrower and Loan 2 Borrower's behalf such other documents and notices as Lender may deem

advisable to protect the collateral and its interests therein and its rights hereunder. Such power being coupled with an interest is irrevocable. Loan 1 Borrower and Loan 2 Borrower irrevocably authorize the filing of a carbon, photographic or other copy of this Agreement only if necessary to perfect the Lender's security interest, or of a financing statement, as a financing statement and agrees that such filing is sufficient as a financing statement.

20. **Obligation to pay Lender's Costs for Due Diligence**. The Loan 1 Obligors and Loan 2 Obligors agree that they are liable for the payment of any title reports, title searches, title policies, UCC-1 searches and filing cost for UCC-1 financing statements, tax searches or environmental reports (including Phase I Environmental reports) requested by Lender with respect to the enforcement of its rights under the Loans or with respect to the negotiation or drafting of this Agreement.

21. **Maximum Rate of Interest**. Notwithstanding any provision in this Agreement or in any instrument now or hereafter evidencing or securing the Loans, the Notes or the other Loan Documents, the total liability for payments of interest, or in the nature of interest, whether before or after the occurrence of an Event of Default, shall not exceed the maximum rate of interest permitted by any applicable laws. Lender and Loan 1 Obligors and Loan 2 Obligors specifically intend and agree to limit contractually the amount of interest payable under the Notes, any of the other Loan Documents and this Agreement to the maximum rate of interest lawfully permitted to be charged under applicable law. Therefore, none of the terms of the Notes or any of the other Loan Documents or this Agreement shall ever be construed to create a contract to pay interest at a rate in excess of the maximum rate permitted to be charged under applicable law, and neither Loan 1 Obligors and Loan 2 Obligors, nor any other party liable or to become liable for the indebtedness of the Loans evidenced by the Notes, the Loan Documents or this Agreement or under any other instruments and agreements related thereto, shall ever be liable for interest in excess of the amount determined at such maximum rate, and the provisions of this **Section 21** shall control over all other provisions of the Notes, the Loan Documents, this Agreement or other instruments relating to the transactions contemplated herein or therein.

If any amount of interest taken or received by Lender shall ever be determined to be in excess of said maximum amount of interest that, under applicable law, could lawfully have been collected by Lender incident to such transactions, then such excess shall, at the election of Lender, either be applied as credit against the then unpaid Loan 1 Indebtedness and Loan 2 Indebtedness or refunded promptly to the party paying such amount. All amounts paid or agreed to be paid in connection with such transactions which would under applicable law be deemed "interest" shall, to the extent permitted by such applicable law, be amortized, prorated, allocated, and spread throughout the stated term of the Note. The term "applicable law" as used in this Agreement means the law in effect from time to time that lawfully permits the charging and collection of the highest permissible lawful, non-usurious rate of interest on the transactions contemplated in the Note and any of the other Loan Documents and this Agreement, including the laws of the Commonwealth of Pennsylvania and of the United States of America.

The term "maximum rate" as used in this **Section 21** means, with respect to each portion of the indebtedness evidenced by the Notes, the maximum lawful, non-usurious rate of interest, if any, that under applicable law Lender is permitted to charge from time to time with respect to the indebtedness evidenced by the Notes. The Loan 1 Obligors and Loan 2 Obligors agree that in determining whether or not any interest payable under the Notes, the Loan Documents and this